799 A.2d 477

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. SHERRON LATIE SAVAGE, DEFENDANT–
APPELLANT.

Argued April 30, 2002—Decided June 20, 2002.

376

378

*Theresa Yvette Kyles,* Assistant Deputy Public Defender, argued the cause for appellant (*Peter A. Garcia,* Acting Public Defender, attorney).

*Steven A. Yomtov,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Acting Attorney General, attorney).

The opinion of the Court was delivered by

LONG, J.

Tried to a jury, defendant Sherron Savage (Sherron) was convicted, in connection with the beating death of Adam Watkins (Watkins), of a series of offenses, including murder, felony murder, kidnapping, and conspiracy. The Appellate Division affirmed those convictions and we granted certification to review trial errors alleged by Sherron, specifically, an inadequate accomplice instruction, failure to charge lesser included offenses, and the erroneous admission of evidence. We have carefully reviewed this record in light of the legal issues raised and now reverse.

## I.

Defendant Sherron Savage and his brother, co-defendant Terrell Savage (Terrell), were charged by indictment with second-degree conspiracy to commit kidnapping and/or murder, in violation of *N.J.S.A.* 2C:5-2, *N.J.S.A.* 2C:13-1 and *N.J.S.A.* 2C:11-3 (Count One); first-degree kidnapping, in violation of *N.J.S.A.* 2C:13-1b(1) (Count Two); first-degree purposeful or knowing murder, in violation of *N.J.S.A.* 2C:11-3a(1) or (2) (Count Three); and first-degree felony murder, in violation of *N.J.S.A.* 2C:11-3a(3) (Count Four). In Count Five, Terrell alone was charged with witness tampering, in violation of *N.J.S.A.* 2C:28-5a. Terrell pled guilty to aggravated manslaughter and was sentenced to a thirty-year custodial term with an 85% period of parole ineligibility.

Sherron went to trial, at which the following facts were established: Just before noon on October 7, 1997, Newark police officer David Figueroa and his partner found Adam Watkins in the fourteenth floor stairwell of Brick Towers, a Newark apartment building. He was badly bruised and, except for a pair of socks, naked. There were no witnesses to what had happened to him. About an hour later, Watkins was pronounced dead at the hospital.

Watkins had been homeless in the days before his death, due to marital difficulties, and had been spending nights at the Brick Towers apartment where Terrell lived with his family (Sherron was staying with his girlfriend in another apartment in that same building). Early on the morning of October 7, 1997, Watkins left the Savage apartment and went to the home of Rashon Baskerville (Baskerville). He arrived there at approximately 8:00 a.m. and fell asleep on the couch.

That same morning, Terrell discovered that a diamond ring, which he believed to be worth $12,000, was missing from his apartment. Shortly after 8:00 a.m., Terrell called and asked Sherron to help search the apartment for the ring. They did not find the ring and, because Terrell suspected that Watkins had stolen the ring, he asked Sherron to take a ride with him to pick

up Watkins. The two drove to Baskerville's house. Terrell entered the house while Sherron waited in the car. A few minutes later, Terrell walked out of the house accompanied by Watkins.

After picking up Watkins at Baskerville's house, Terrell drove to see Kenneth Long (Long), the owner of Kenyor Auto Body. Long testified that Watkins was sitting in the back seat and "had his face up against the glass [of the car window] . . . and 'looked scared.' " Long could not see Sherron's face because of the tinted windows on the car. Long further testified that Watkins "was sitting like he wanted to jump out of the car or something." Terrell told Long that Watkins had been at his home and that his ring was missing. Terrell also told Long that if Watkins took the ring, he was "going to beat him up."

Terrell then drove back to Baskerville's house. According to a written statement given to police by Baskerville, most of which he denied making or could not recall at trial, Terrell told Baskerville "that nigger crossed me," referring to the fact that he allowed Watkins to stay at his home and that Watkins had apparently stolen his diamond ring. When Baskerville asked about Watkins, Terrell told him that Watkins was in his car. Baskerville went outside and observed Watkins sitting in the back seat and Sherron in the front passenger seat.

At some point, Watkins told Baskerville that Terrell's ring was inside the house. When Baskerville said that Watkins could retrieve the ring, Terrell said that Watkins could not get out of the car. Nevertheless, Baskerville, without objection from Terrell, opened the car door for Watkins. Watkins stepped out of the car and entered the house with Terrell and Baskerville. While in the house, Watkins retrieved the ring and returned it to Terrell. Subsequently, Watkins walked out of the house with Terrell and got back into the car. Terrell then drove off with Watkins and Sherron.

Around noon, Terrell called Baskerville and told him, "that cat ain't breathing" (apparently referring to Watkins). According to Baskerville's statement, Terrell asked Baskerville to meet him at

Long's auto body shop because, by that time, Watkins' body had been found and there was a large police presence at Terrell's apartment building. Shortly after that call, however, Terrell came to Baskerville's house and said, "[Y]o, man, I don't think that cat was breathing; I hope he ain't dead." Terrell then asked Baskerville to go to the hospital and check on Watkins. Terrell left after Baskerville refused to go to the hospital or to become involved in any way. Subsequently, Baskerville went to the hospital with Alston to find out Watkins' condition. At that time, Baskerville learned that Watkins had been beaten to death.

Around 7:30 p.m., Terrell returned to Long's auto body shop and admitted to Long that "we beat him up" and that Watkins was probably dead. Terrell told Long that if the police questioned him, he should tell them that Terrell was with him at the shop.

Around 8:30 or 9:00 p.m., Terrell drove to Baskerville's house where he learned that Watkins was, in fact, dead. Upon learning of Watkins' death, Terrell began to cry and asked Baskerville what charges could be brought against him. When Baskerville inquired how the assault took place, Terrell stated that "he and [Watkins] were fighting and his brother and his friends bone rushed him" and Terrell could not stop it. Terrell also told Baskerville that he and Sherron removed Watkins' clothes to humiliate Watkins and to teach him a lesson.

Both Baskerville and Long cooperated with the police investigation. Based on their statements to police, Terrell was indicted first and Sherron was later charged. At trial, the medical examiner, Leonard Zaretski, M.D., testified that the cause of Watkins' death was homicide-blunt force trauma to the head and that the other injuries Watkins sustained were "superficial."

Sherron's testimony at trial was similar to Baskerville's statement. He stated that he had agreed to help Terrell search for the ring. After they were unable to locate it, Sherron went to the store to purchase cigarettes. On his return, Terrell asked Sherron to take a ride with him to get Watkins. When the brothers arrived at Baskerville's home, Sherron remained in the car listen-

ing to the radio while Terrell went inside. Terrell came out of the house with Watkins, who entered the car of his own volition. Sherron had no recollection of going to Long's auto body business. According to him, while driving away from Baskerville's house, Watkins told Terrell that the ring was at the house. Sherron testified that they drove back to Baskerville's house where Terrell and Watkins, in Baskerville's presence, retrieved the ring. Sherron further testified that, after they retrieved the ring, Watkins re-entered the car voluntarily.

According to Sherron, the three men returned to Terrell's apartment building so that Terrell "could beat [Watkins] ... for stealing out of the house after he gave him somewhere to stay." Sherron testified that Terrell's intention was "[t]o teach a lesson, to teach [Watkins] not to steal from him. Not to kill Adam, just to beat him up." During the fifteen to twenty minute ride back to the apartment building, Sherron testified that Terrell spoke with Watkins about the disappearance of the ring and said to Watkins, "How could you do this to me, you know, man, you know, take from me after I done so much for you?" When the three men arrived at the apartment complex, they walked past a number of people and a security guard. Terrell and Watkins continued their conversation about the ring and Watkins continued to apologize for taking it.

Sherron testified that, when the three men entered the elevator to the brothers' apartment building, Terrell punched Watkins in the face. The elevator door opened on the sixteenth floor and Terrell and Watkins fell out of the elevator. Terrell hit Watkins in the face five or six times, causing him to fall to the ground. Sherron admitted that he kicked Watkins in his side once, when Watkins tried to get up from the floor. (In his statement to the police that was referred to at trial, Sherron stated that he delivered "kicks" to Watkins' side.) More specifically, Sherron testified that, when Watkins attempted to get up on his hands and knees, he "kicked him in the side" because he "thought he was going to get up and rush—I thought he was trying to get up to

come at my brother." Sherron admitted that he was "mad" at Watkins for stealing from his mother's home but said that he kicked Watkins because he did not want him to be in a position to attack Terrell. Sherron told Terrell to stop hitting Watkins because "you done proved your point to him, you taught him a lesson." According to Sherron, the brothers left Watkins sitting on the floor, fully clothed. After leaving the building, Sherron testified that he had no idea where Terrell went.

Based on the foregoing evidence, a jury convicted Sherron on all counts. At sentencing, the trial court merged the conspiracy conviction into the kidnapping conviction and the felony murder conviction into murder. The court then sentenced Sherron to a custodial term of life in prison for murder, with an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA) and to a concurrent thirty-year term of imprisonment with a twenty-five and one-half year period of parole ineligibility pursuant to NERA, for first-degree kidnapping.

The Appellate Division affirmed, but vacated the NERA aspect of Sherron's murder sentence. The State filed a petition for certification regarding the NERA sentence and Sherron filed a cross-petition alleging trial error. On January 16, 2002, we denied the State's petition and granted Sherron's cross-petition. *State v. Savage*, 171 *N.J.* 40, 791 *A.*2d 219 (2002).

## II.

Sherron challenges the instruction on accomplice liability as legally incorrect and not tailored to the facts; contends that a jury question revealed a misunderstanding regarding the accomplice liability charge that was not clarified by the court; argues that the court erred in refusing to charge the jury on criminal restraint and false imprisonment as lesser included offenses of kidnapping; and maintains that Terrell's statements to Baskerville after the

crime should not have been admitted under the co-conspirator exception to the hearsay rule.

The State counters that the accomplice instruction was fully supported by applicable legal principles; that it was properly tailored insofar as it apprised the jury of Sherron's theory of the case; that even if the charge was inadequate, the conspiracy and felony murder convictions would stand; that there was no rational basis in the evidence to support the lesser included offenses of criminal restraint or false imprisonment; and that Terrell's statements to Baskerville were admissible because they were made in furtherance of the conspiracy.

## III.

We turn first to the jury instructions on accomplice liability. Because those instructions were never objected to at trial, they must be evaluated under the plain error standard. *R.* 2:10–2; *State v. Afanador*, 151 *N.J.* 41, 54, 697 *A.*2d 529 (1997) (noting that "reviewing court may reverse on basis of unchallenged error only if it finds plain error clearly capable of producing an unjust result").

It is a well-settled principle that appropriate and proper jury charges are essential to a fair trial. *State v. Collier*, 90 *N.J.* 117, 122, 447 *A.*2d 168 (1982) (*citing State v. Green*, 86 *N.J.* 281, 287, 430 *A.*2d 914 (1981)). A jury charge constitutes "a road map to guide the jury and without an appropriate charge a jury can take a wrong turn in its deliberations." *State v. Martin*, 119 *N.J.* 2, 15, 573 *A.*2d 1359 (1990). A portion of a charge alleged to be erroneous, however, "cannot be dealt with in isolation ... [and] should be examined as whole to determine its overall effect." *State v. Wilbely*, 63 *N.J.* 420, 422, 307 *A.*2d 608 (1973). The standard for assessing the soundness of a jury instruction is " 'how and in what sense, under the evidence before them, and the circumstances of the trial, would ordinary ... jurors understand the instructions as a whole.' " *Crego v. Carp*, 295 *N.J.Super.* 565, 573, 685 *A.*2d 950 (App.Div.1996), *certif. denied*, 149 *N.J.* 34, 692

A.2d 48 (1997) (quoting *Davidson v. Fornicola*, 38 *N.J.Super.* 365, 371, 118 *A.2d* 838 (App.Div.1955), *certif. denied*, 20 *N.J.* 467, 120 *A.2d* 275 (1956)).

■ When a prosecution is based on the theory that a defendant acted as an accomplice, the trial court is required to provide the jury with understandable instructions regarding accomplice liability. *State v. Weeks*, 107 *N.J.* 396, 410, 526 *A.2d* 1077 (1987).

"By definition an accomplice must be a person who acts with the purpose of promoting or facilitating the commission of the substantive offense for which he is charged as an accomplice." *State v. White*, 98 *N.J.* 122, 129, 484 *A.2d* 691 (1984). Therefore, a jury must be instructed that to find a defendant guilty of a crime under a theory of accomplice liability, it must find that he "shared in the intent which is the crime's basic element, and at least indirectly participated in the commission of the criminal act." *State v. Fair*, 45 *N.J.* 77, 95, 211 *A.2d* 359 (1965).

In addition, when lesser included offenses are submitted to the jury, the court has an obligation to "carefully impart[ ] to the jury the distinctions between the specific intent required for the grades of the offense." *State v. Weeks, supra*, 107 *N.J.* at 410, 526 *A.2d* 1077. The court made essentially the same point in *State v. Fair, supra*, 45 *N.J.* at 95, 211 *A.2d* 359:

If both parties enter into the commission of a crime with the same intent and purpose each is guilty to the same degree; but each may participate in the criminal act with a different intent. Each defendant may thus be guilty of a higher or lower degree of crime than the other, the degree of guilt depending entirely upon his own actions, intent and state of mind.

And speaking with reference to a deadly assault committed by more than one person, Chief Justice Weintraub explained in *State v. Madden*, 61 *N.J.* 377, 391, 294 *A.2d* 609 (1972):

[I]f several participate in an attack and death results, the degree of the offense as to each may turn upon his own acts and purpose. Thus if two should attack and one of them intends only a simple assault and battery and is unaware of the intent of the other to use deadly force, he would be culpable only according to his own intent and wrong. But if he participates in an attack or continues in it with an awareness of the purpose of others to kill or to do grievous bodily harm, he is chargeable with that further intent and result.

[Citations omitted.]

*See also State v. Thomas*, 76 *N.J.* 344, 355–57, 387 *A.2d* 1187 (1978); *State v. Dissicini*, 126 *N.J.Super.* 565, 570, 316 *A.2d* 12 (App.Div.1974), *aff'd o.b.*, 66 *N.J.* 411, 331 *A.2d* 618, (1975).

[*State v. Bielkiewicz*, 267 *N.J.Super.* 520, 528, 632 *A.2d* 277 (App.Div.1993).]

*See also State v. Harrington*, 310 *N.J.Super.* 272, 278, 708 *A.2d* 731 (App.Div.), *certif. denied*, 156 *N.J.* 387, 718 *A.2d* 1216 (1998) (reversing defendant's convictions because accomplice liability

charge "inextricably link[ed] the criminal liability of the accomplice with the criminal liability of the principal"); *State v. Williams,* 298 *N.J.Super.* 430, 440, 689 *A.*2d 821 (1997) (finding harmless error trial court's failure to instruct jury that accomplice may be guilty of aggravated or reckless manslaughter while principal is guilty of murder because defendant was found guilty of lesser included offense of aggravated manslaughter and not murder); *State v. Jackmon,* 305 *N.J.Super.* 274, 286, 702 *A.*2d 489 (App.Div.1997) (reversing defendant's murder and attempted murder convictions because jury instructions did not adequately convey that, even if principal committed purposeful or knowing murder, accomplice could be found guilty of lesser offense).

■ In addition to requiring trial courts to instruct juries that an accomplice can have a different mental state from that of the principal, our courts regularly have noted the importance of tailoring the jury charge to the facts of the case. For example, in *State v. Cook,* 300 *N.J.Super.* 476, 693 *A.*2d 483 (App.Div.1996), in the context of accomplice liability, defendant argued that the charge failed to explain to the jury that it could find him guilty as an accomplice to the lesser included offenses of aggravated manslaughter or manslaughter even if it found that the co-defendant committed purposeful or knowing murder. The Appellate Division noted that

> the jury should have been advised in unequivocal terms that, depending on its view of the evidence, it could decide that the liability of Cooke was different from that of [co-defendant] Vaughn because each had a different state of mind.
>
> [*Id.* at 487–488, 693 *A.*2d 483.]

Importantly, the court underscored that to impart that basic notion to the jury regarding levels of culpability, "the jury needed a detailed explanation of accomplice liability theory *tied to the facts.*" *Id.* at 488, 693 *A.*2d 483 (emphasis added).

We have reaffirmed the need for jury instructions to relate the law to the facts of a case in other contexts. *See generally, State v. Sexton,* 160 *N.J.* 93, 106, 733 *A.*2d 1125 (1999) (holding that because mistake was offered as defense to manslaughter charge, trial court should have tailored charge to factual circumstances of

case and explained how mistake relates to recklessness); *State v. Morton*, 155 *N.J.* 383, 422, 715 *A.*2d 228 (1998) (rejecting defendant's contention that jury charge insufficiently tailored charge to facts of case, reasoning that, in explaining accomplice liability charge, court informed jury of legal significance that co-defendant, not defendant, committed actual murder and that "court wove the facts into the charge"); *State v. Gartland*, 149 *N.J.* 456, 475–77, 694 *A.*2d 564 (1997) (finding jury charges on duty to retreat and self-defense "were largely devoid of reference to the specific circumstances of the case"); *State v. Olivio*, 123 *N.J.* 550, 567–68, 589 *A.*2d 597 (1991) (noting that "an instruction solely in terms of the language of the statute will not give sufficient guidance to the jury and engenders too great a risk that the jury's ultimate determination of guilt or innocence will be based on speculation, misunderstanding, or confusion"); *State v. Martin*, 119 *N.J.* 2, 18, 573 *A.*2d 1359 (1990) (explaining that where two conflicting versions of events are presented, "court should mold instructions to factual hypotheses of parties"); *State v. Concepcion*, 111 *N.J.* 373, 380, 545 *A.*2d 119 (1988) ("Incorporating specific evidentiary facts into a jury charge is especially helpful in a protracted trial with conflicting testimony."); *State v. Green*, 86 *N.J.* 281, 287–88, 430 *A.*2d 914 (1981) (observing that appropriate and proper jury charges entail "a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find"). That is the backdrop on which the accomplice instruction in this case must be evaluated.

 In a two-hour jury instruction, after delineating the elements of all of the offenses with which Sherron was charged, including the lesser included offenses of murder (passion provocation, manslaughter, aggravated manslaughter, reckless manslaughter, second-degree aggravated assault, third-degree aggravated assault, and simple assault), the court proceeded to instruct the jury on accomplice liability, charging, in pertinent part:

> I am going to talk to you now about accomplice liability. And you will remember that as to the charge in count three, the murder charge, there are lesser included charges.

As you know, the State alleges that the defendant Sherron Savage is legally responsible for the criminal conduct of his co-defendant Terrell Savage as to the charges of kidnapping, and knowingly or purposeful murder and the lesser included charges of that knowing and purposeful murder.

After defining the term "accomplice," the court stated:

This provision of the law then means that not only is the person who actually commits the criminal act responsible for it, but one who is legally accountable as an accomplice is also responsible. Now this responsibility as an accomplice may be equal and the same as he who actually committed the crime, or there may be responsibility in a different degree depending on the circumstances as you find them to be.

Let me repeat that. This responsibility as an accomplice may be equal and the same as he who actually committed the crime, or there may be responsibility in a different degree depending upon the circumstances as you find them to be. I will explain further this distinction in a moment.

After explaining the State's claim that Sherron was equally guilty of the crimes committed by Terrell because he acted as an accomplice, the trial court instructed the jury that the State had to prove, beyond a reasonable doubt, each of the following elements:

That in this case that the charge being considered was committed by Terrell Savage. That this defendant either committed the offense himself or solicited Terrell Savage to commit it and/or aid or agree or attempt to aid Terrell Savage in planning or committing it.

Three, that the defendant had the purpose to promote or facilitate the commission of the offense charged.

And, four, that the defendant possessed the criminal state of mind that is required to be proved against the person who actually committed the criminal act, or some lesser culpable state of mind that I will address later in my charge.

. . . .

Now, let me remind you that you should consider that accomplice status separately as to each charge.

. . . .

Remember that this defendant can be held to be an accomplice with equal responsibility only if you find as a fact that he possessed the criminal state of mind that was required to be proved against the person who actually committed the criminal act.

In order to convict a defendant as an accomplice to the specific crime charged, you must find that the defendant had the purpose to participate in that particular crime. He must act with a purpose of promoting or facilitating the commission of the substantive crime with which he is charged.

. . . .

In sum, in order to find ... this defendant who you are considering guilty of committing the crime which you are considering on an accomplice theory, the State must prove each of the following elements beyond a reasonable doubt: One, that the charge being considered was committed by Terrell Savage.

Two. That this defendant either committed the offense himself or solicited Terrell Savage to commit it and/or did or agree or attempt to aid Terrell Savage in planning or committing it.

Three. That the defendant had a purpose to promote or facilitate the commission of the offense.

And, four, that the defendant Sherron Savage possessed the criminal state of mind that is required to be proved against the person, in this case it would be alleged on the accomplice theory Terrell Savage, who actually committed the criminal act, or some lesser culpable state of mind.

Now, again, I remind you you should consider the accomplice status separately as to each charge, the charge of kidnapping and the charge as to murder and the lesser included charges.

. . . .

If you find the defendant guilty of a specific crime which you are considering in that he acted with the same mental state as Terrell Savage, then you need not consider any lesser charge.

If, however, you find ... the defendant not guilty of acting as an accomplice of Terrell Savage on a specific crime charged, then you should consider whether the defendant did act as an accomplice of Terrell Savage but that he acted with a purpose of promoting or facilitating the commission of some lesser offense than the actual crime charged in the indictment.

Our law recognizes that two or more persons may participate in the commission of an offense but each may participate therein with a different state of mind. The liability or responsibility of each participant for any ensuing offense is dependent upon his own state of mind and not on anyone else's. In this case not on Terrell Savage's state of mind.

Guided by these principles, and if you have found the defendant not guilty of a specific crime charged, you should then consider whether the defendant is guilty or not guilty as an accomplice on a lesser charge for that crime. Now, I have previously defined for you murder and the lesser included charges, passion provocation, manslaughter, aggravated manslaughter, reckless manslaughter, second degree aggravated assault, third degree aggravated assault, and simple assault.

In considering whether the defendant is guilty or not guilty as an accomplice on a lesser included charge remember that each person who participates in the commission of an offense may do so with a different state of mind. And the liability or responsibility of each person is dependent upon his own state of mind and no one else's.

Therefore, when considering lesser included offenses, which I previously described when we talked about murder, the State must prove beyond a reasonable doubt; one, that the charge being considered or a lesser included offense of that

charge was committed by, again we are talking about the accomplice theory, so by Terrell Savage.

Two, that this defendant either committed the offense, the lesser included offense himself or did aid or agree or attempt to aid Terrell Savage in committing or planning to commit the lesser included offense.

Three, that the purpose of the defendant was to promote or facilitate the commission of the lesser included offense.

And, four, that the defendant possessed a criminal state of mind that is required for the commission of the offense.

. . . .

[I]n short, even if you conclude that Sherron Savage was not a principal and that the principal, that would be Terrell Savage, committed purposeful and knowing murder, the accomplice can be found guilty of the same crime or a lesser included offense. For it is only Sherron Savage's mental state that is at issue in this trial.

We disagree with the defense contention that that instruction was internally inconsistent or legally deficient. In our view, the jury charge was, in its expression of relevant legal principles, entirely correct. The trial court properly instructed the jury that to hold Sherron guilty as an accomplice with equal responsibility to Terrell, it had to find that Sherron shared the purpose to commit the crime Terrell committed. Specifically, the court stated: "[T]his defendant can be held to be an accomplice with equal responsibility only if you find as a fact that . . . defendant had the purpose to participate in [the substantive crime]." In addition, the court instructed the jury that, even if it concluded that Terrell was guilty of murder as a principal, it could find Sherron guilty of some lesser included offense:

[o]ur law recognizes that two or more persons may participate in the commission of an offense but each may participate therein with a different state of mind. The liability . . . of each participant for any ensuing offense is dependent upon his own state of mind not . . . [i]n this case . . . on Terrell Savage's state of mind.

■ To be sure, the trial court failed to articulate factually how Terrell could have been guilty of purposeful or knowing murder, and Sherron guilty of one of the lesser offenses, for example, aggravated or simple assault, if he possessed a different state of mind. Indeed, the court's "canned" accomplice liability instruction was not tied to the facts at all and, in that respect, violated our often-expressed exhortation that, to serve its purpose, a charge,

especially a complex one, should be tethered to the facts that the jury has heard.

■ However, because the trial court instructed the jury in accordance with relevant legal principles, under ordinary circumstances, we would presume that the jury understood and followed those instructions. *See, e.g., State v. Burris,* 145 *N.J.* 509, 679 *A.*2d 121 (1996) (*citing State v. Manley,* 54 *N.J.* 259, 270, 255 *A.*2d 193 (1969) (stating that, with regard to proper use of evidence, "the Court presumes that juries will understand and abide by the court's instruction")). We cannot indulge that presumption here because, as we have indicated, the jury asked the following question:

Because of the wording on the counts it seems we have to vote guilty because of the "law." Some of us don't believe the defendant was the instigator or planned the murder, but because of the wording we cannot express these feelings.

In response, the trial court answered essentially that *it* was the judge of the law, not the jury; that the jury was required to follow the law; and if it needed further instructions, they would be given.

The State argues that the jury's note could be taken to mean (as the trial court obviously assumed) that the jury was not happy with the law. However, it could also reasonably be construed to mean that the jury believed that Sherron did not share Terrell's intent to kill Watkins, but that, because he participated in some respect in the events surrounding Watkins' death, he had to be found guilty of murder under the wording of the verdict form. Put another way, the question poses the possibility that the jury did not understand the accomplice charge or that Sherron could be found guilty of a different offense than Terrell, based on his state of mind.

■ It is firmly established that "[w]hen a jury requests a clarification," the trial court "is obligated to clear the confusion." *State v. Conway,* 193 *N.J.Super.* 133, 157, 472 *A.*2d 588 (App.Div. 1984), *certif. denied,* 97 *N.J.* 650, 483 *A.*2d 174 (1984). Further, if the jury's question is ambiguous, the trial court must clarify the jury's inquiry by ascertaining the meaning of its request. *State v.*

*Graham,* 285 *N.J.Super.* 337, 342, 666 *A.*2d 1372 (App.Div.1995). The trial court's failure to inquire further into the jury's note and to re-explain the accomplice charge in the context of the facts was plain error. The jury had to understand that, because Sherron was guilty of something, his culpability did not have to match Terrell's. There was evidence in this record from which the jury could have concluded that Terrell purposely committed murder, but that Sherron, although a participant in the events that led to Watkins' death, did not share Terrell's intent to kill Watkins or to inflict injury on him and was not even aware that that was Terrell's purpose. According to Sherron, he landed only a single kick to Watkins' side, which the State's expert denominated as causing only "superficial injuries." It was not until Watkins attempted to get up on his hands and knees that Sherron did anything. Sherron testified that he kicked Watkins because he thought that Watkins was going to attack Terrell. Sherron also testified that he told Terrell to stop hitting Watkins because he believed that Watkins had "learned his lesson." Under those circumstances, if it understood the accomplice liability charge, the jury could have found that Sherron did not intend to cause death or serious bodily injury. Because the evidence does not necessarily support a finding that Sherron shared the same homicidal state of mind as Terrell, the supplemental jury instructions were inadequate to guide the jury in the course of its deliberations on the murder charge. Thus, the conviction for knowing and purposeful murder must be reversed.

## IV.

We turn next to Sherron's claim that the felony murder and kidnapping convictions must also be reversed because the trial court failed to instruct the jury regarding the lesser included offenses of criminal restraint and false imprisonment.

At trial, defense counsel requested that the trial court charge the jury with criminal restraint, *N.J.S.A.* 2C:13–2, as a lesser included offense of kidnapping. The trial court refused to

do so, finding that criminal restraint was "precluded" because there was "clearly a death here." The Appellate Division affirmed that decision, finding that "there was no rational basis in the proofs to support submission of criminal restraint as a lesser included charge." Here, Sherron asserts that the trial court erred by failing to give the criminal restraint instruction at defense counsel's request and the false imprisonment charge *sua sponte.* We note that, because neither criminal restraint nor false imprisonment is enumerated in *N.J.S.A.* 2C:11–3, a death during the commission of one of those offenses does not provide a statutory basis for a felony murder conviction.

■ Pursuant to *N.J.S.A.* 2C:1–8e, a court "shall not charge the jury with respect to an included offense unless there is a rational basis" to convict a defendant of a lesser included offense. In order to justify a lesser included offense instruction, a rational basis must exist in the evidence for a jury to acquit the defendant of the greater offense as well as to convict the defendant of the lesser, unindicted offense. *State v. Brent,* 137 *N.J.* 107, 113–14, 644 *A.*2d 583 (1994).

We have held that a defendant "is entitled to a charge on all lesser included offenses supported by the evidence." *State v. Short,* 131 *N.J.* 47, 53, 618 *A.*2d 316 (1993); *State v. Purnell,* 126 *N.J.* 518, 531, 601 *A.*2d 175 (1992) (stating that "a trial court must charge the jury regarding 'all of the possible offenses that might reasonably be found from such facts.' ") (*citing State v. Ramseur,* 106 *N.J.* 123, 271 n. 62, 524 *A.*2d 188 (1987)). As defined by *N.J.S.A.* 2C:1–8d, an offense is "included" if:

(1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

(2) It consists of an attempt or conspiracy to commit the offense charged or to commit an offense otherwise include therein; or

(3) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interest or a lesser kind of culpability suffices to establish its commission.

■ In assessing whether to charge the jury on a lesser included offense, our case law applies a different standard based

on whether or not a charge was requested by a defendant at trial. An unrequested charge on a lesser included offense must be given only where the facts in evidence "clearly indicate" the appropriateness of that charge. *State v. Choice,* 98 *N.J.* 295, 298, 486 *A.*2d 833 (1985) (*citing State v. Powell,* 84 *N.J.* 305, 319, 419 *A.*2d 406 (1980); *State v. Grunow,* 102 *N.J.* 133, 148–49, 506 *A.*2d 708 (1986) (noting that "a court ordinarily has supervening responsibility to charge the jury concerning any version of the offense 'clearly indicate[d]' by the evidence to require proper jury consideration")). Accordingly, a trial court "should not 'scour the statutes to determine if there are some uncharged offenses of which the defendant may be guilty.' " *State v. Brent, supra,* 137 *N.J.* at 118, 644 *A.*2d 583; *see also State v. Choice, supra,* 98 *N.J.* at 299, 486 *A.*2d 833 (stating that trial court does not "have the obligation on its own meticulously to sift through the entire record" to find appropriate charges).

▮▮▮▮ In contrast, when a defendant requests a lesser included offense to be charged, we have recognized that a strict adherence to the definition of "included" under *N.J.S.A.* 2C:1–8d "is less important than whether the evidence presents a rational basis on which the jury could acquit the defendant of the greater charge and convict the defendant of the lesser." *Brent, supra,* 137 *N.J.* at 117, 644 *A.*2d 583; *see also Purnell, supra,* 126 *N.J.* at 531, 601 *A.*2d 175 (*citing State v. Sloane,* 111 *N.J.* 293, 300, 544 *A.*2d 826 (1988) ("the statutory definition of lesser-included offenses ... is not 'all-encompassing,' nor are the statutory categories 'watertight compartments.' ")). Accordingly, when a lesser offense is requested by a defendant, as in this case, "the trial court is obligated, in view of defendant's interest, to examine the record thoroughly to determine if the rational-basis standard has been satisfied." *State v. Crisantos,* 102 *N.J.* 265, 278, 508 *A.*2d 167 (1986). The question is not whether the jury is likely to accept the defendant's theory, but whether it would have a rational basis on which to do so. *State v. Mejia,* 141 *N.J.* 475, 489, 662 *A.*2d 308 (1995). The failure to instruct the jury on a lesser included

offense that a defendant has requested and for which the evidence provides a rational basis warrants reversal of a defendant's conviction. *Brent, supra,* 137 *N.J.* at 118, 644 *A.*2d 583.

Sherron was charged with first-degree kidnapping. Under *N.J.S.A.* 2C:13–1b, a person commits kidnapping

if he unlawfully removes another from his place of residence or business, or a substantial distance from the vicinity where he is found, or if he unlawfully confines another for a substantial period, with any of the following purposes:

(1) To facilitate commission of any crime or flight thereafter;

(2) To inflict bodily injury on or to terrorize the victim or another;

(3) To interfere with the performance of any governmental or political function; or

(4) To permanently deprive a parent, guardian or other lawful custodian of custody of the victim.

As defined by *N.J.S.A.* 2C:13–1d, "confinement" or "removal" are "unlawful" when accomplished by "force, threat or deception."

 Criminal restraint, a closely-related third-degree crime occurs when a person "knowingly . . . [r]estrains another unlawfully in circumstances exposing the other to risk of serious bodily injury." *N.J.S.A.* 2C:13–2. Our Court has recognized that criminal restraint functions as a lesser included offense of kidnapping. *See, e.g., Brent, supra,* 137 *N.J.* at 122, 644 *A.*2d 583 (noting that kidnapping by removal and criminal restraint can be proved by the same set of facts).

The question is whether any view of the evidence in this case presented a rational basis for the jury to acquit Sherron of kidnapping and, alternatively, to convict him of criminal restraint. The answer is yes. Under the State's theory of the case, Terrell and Sherron kidnapped Watkins by unlawfully removing him from Baskerville's home, driving him around to locate the ring, and bringing him to a isolated stairwell for the purpose of assaulting him. In support of that theory, Long testified that, when Terrell drove to his auto body shop on the morning of October 7th, Long saw Watkins in the back seat of the car looking "sad," "a little scared," and "sitting like he wanted to jump out [of] the car or something." Additionally, Baskerville's statement recounted that Terrell had said that Watkins "couldn't get out the car."

Although the State suggested in its summation that the brothers "grabbed" Watkins from Baskerville's house while Baskerville was still asleep, there is no evidence in the record to support that assertion. A jury could have reached other equally rational, conclusions from Long's testimony and Baskerville's statement. Long testified, for example, that he could not read the facial expression or otherwise identify anyone else in the car except Watkins due to the dark tint of the car's windows, thus eliminating any suggestion that Long witnessed threatening conduct by Sherron. Watkins also made no attempt to speak to Long or exit from the car. Moreover, a jury could conclude that Watkins' hang-dog expression resulted, not from being held against his will, but because his thievery from his "best friend" had been revealed and he knew that he deserved and would receive Terrell's opprobrium or worse.

Likewise, Baskerville's statement was open to other reasonable interpretations. As the State noted in its summation, Baskerville flatly denied or could not recall the majority of his statement at trial. But even if the jury accepted it as true, in his statement Baskerville said that he opened the car door for Watkins without any objection from Terrell or Sherron; and that Watkins retrieved the ring from Baskerville's house, gave it back to Terrell, and got back into the car with the brothers without attempting to remain at Baskerville's house, evade the brothers, or otherwise demonstrate that he was being held against his will.

No direct evidence existed that the brothers removed Watkins from Baskerville's house on either occasion or confined him by force, threat, or deceit. Accepting all reasonable inferences from Long and Baskerville's testimony, a jury could have found that Watkins accompanied the brothers voluntarily, if remorsefully, as they drove from one location to the next. That conclusion was bolstered by Sherron's statement that Watkins walked with the brothers past several people, including a security guard, through the apartment complex and into their building of his own will. In

sum, a jury could reasonably have acquitted Sherron of the kidnapping charge.

In the alternative, the evidence at trial provided a rational basis to charge the jury on criminal restraint. Although a jury could have found that there were no overt indications that Watkins was being unlawfully removed or confined prior to going to the apartment building, it could also have determined that, at the point that Sherron kicked Watkins when he tried to rise up, he unlawfully restrained him. Moreover, despite Sherron's testimony that he did not know that Terrell would assault Watkins until it occurred in the elevator, jurors could have determined that Sherron, in fact, knew of Terrell's intention to beat up Watkins as he stated in his initial statement to police. Moreover, a jury could have concluded that, at the very least, Sherron was aware of Terrell's intentions in the elevator and on the landing when he observed him administer a beating to Watkins. As a result, the jury could have found that, by assisting Terrell in restraining Watkins, Sherron exposed him to "serious bodily injury" at Terrell's hands, meeting the elements of criminal restraint. Under those circumstances and in light of Sherron's request, we conclude that the trial court erred by not instructing the jury on criminal restraint as a lesser included offense of kidnapping and that that error requires reversal of the conspiracy and murder convictions.

Sherron also argues that the trial court should have charged the jury on false imprisonment *sua sponte*. False imprisonment, a disorderly persons offense, occurs when a person "knowingly restrains another unlawfully so as to interfere substantially with his liberty." *N.J.S.A.* 2C:13–3. False imprisonment is complete upon an unlawful restraint that interferes with a victim's liberty. No further wrongful purpose is required. *State v. LaFrance*, 117 *N.J.* 583, 591, 569 *A.*2d 1308 (1990). The difference between false imprisonment and third-degree criminal restraint is that the latter requires that the restraint be "in circumstances exposing the other to risk of serious bodily injury." *N.J.S.A.*

2C:13–2(a); *State v. Bragg*, 295 *N.J.Super.* 459, 469–70, 685 *A.*2d 488 (1996).

As we have indicated, a jury could acquit Sherron of kidnapping and could conclude that Sherron unlawfully restrained Watkins when he kicked him as Watkins attempted to rise during the beating administered by Terrell. However, there is no rational basis for a jury to conclude that, by that point, Sherron's actions did not expose Watkins to the risk of serious bodily injury by Terrell. We, therefore, conclude that the court had no duty to instruct the jury *sua sponte* on false imprisonment because the evidence did not clearly indicate or warrant such a charge. *See, e.g., State v. Turner*, 246 *N.J.Super.* 22, 586 *A.*2d 850 (App.Div.), *certif. denied*, 126 *N.J.* 335, 598 *A.*2d 892 (1991) (finding trial court not required to charge third-degree aggravated assault as lesser included offense due to severity of victim's injury); *State v. Mance*, 300 *N.J.Super.* 37, 691 *A.*2d 1369 (App.Div.1997) (finding no rational basis for lesser included charge of fourth-degree aggravated assault because no evidence to support mental state of recklessness).

In sum, we determine that the trial court should have charged the jury, at Sherron's request, on criminal restraint as a lesser included offense of kidnapping. We arrive at that conclusion after considering all reasonable inferences to be drawn from the evidence at trial and the State's theory of the case. Thus, Sherron's convictions for kidnapping and conspiracy must be reversed. Depending on the evidence adduced at the next trial, the court will be required to reevaluate the issue of which lesser-included offenses must be charged.

V.

Our reversal of Sherron's convictions and the requirement of a new trial makes it unnecessary for us to address the evidentiary issue he raises. We choose to comment briefly, however.

"A statement, made other than by the witness while testifying, offered to prove the truth of the content of the statement is hearsay evidence and is inadmissible unless it falls within one of the hearsay exceptions." *State v. Phelps*, 96 *N.J.* 500, 508, 476 *A.*2d 1199 (1984). The exceptions to the hearsay rule "are justified primarily because the circumstances under which the statements are made provide strong indicia of reliability." *Ibid.* The co-conspirator exception to the hearsay rule, embodied in *N.J.R.E.* 803(b)(5), provides that statements made "at the time the party and the declarant were participating in a plan to commit a crime" and "made in furtherance of that plan," are admissible into evidence against another member of the conspiracy. *N.J.R.E.* 803(b)(5). The rationale for the co-conspirator exception is that "because conspirators are substantively liable for the acts of their co-conspirators, they are equally responsible for statements by their confederates to further the unlawful plan." *State v. Harris*, 298 *N.J.Super.* 478, 487, 689 *A.*2d 846 (App.Div.), *certif. denied*, 151 *N.J.* 74, 697 *A.*2d 546 (1997).

That the co-conspirator exception does not offend the Sixth Amendment's guarantee of a defendant's right to confront the witnesses against him is well-established. *Bourjaily v. United States*, 483 *U.S.* 171, 183–84, 107 *S.Ct.* 2775, 2783, 97 *L.Ed.*2d 144, 157–58 (1987); *State v. Boiardo*, 111 *N.J.Super.* 219, 229, 268 *A.*2d 55 (App.Div.), *certif. denied*, 57 *N.J.* 130, 270 *A.*2d 33 (1970), *cert. denied*, 401 *U.S.* 948, 91 *S.Ct.* 931, 28 *L.Ed.*2d 231 (1971). To qualify for admissibility under the rule, the State must meet the following conditions: (1) the statement must have been made in furtherance of the conspiracy; (2) the statement must have been made during the course of the conspiracy; and (3) there must be "evidence, independent of the hearsay, of the existence of the conspiracy and defendant's relationship to it." *Phelps, supra*, 96 *N.J.* at 509–10, 476 *A.*2d 1199. The first two conditions of the rule "reflect notions that an agent's statements are vicariously attributable to a principal." *Id.* at 510, 476 *A.*2d 1199. The third condition "reduces the fear that a defendant might be convicted or

held liable in damages solely on the basis of evidence that he has had no opportunity to impeach or refute." *Id.* at 510–11, 476 *A.*2d 1199.

A conspiracy continues until its objective is fulfilled. *Cherry, supra,* 289 *N.J.Super.* at 523, 674 *A.*2d 589. If a statement is made after the conspiratorial objective is completed, it is generally not admissible under the co-conspirator exception. *State v. Sparano,* 249 *N.J.Super.* 411, 420–21, 592 *A.*2d 608 (App.Div.1991). Here, the objective of the conspiracy, teaching Watkins a lesson, was unfortunately fulfilled when he was killed. However, a conspiracy may continue beyond the actual commission of the object of the conspiracy if it is shown that a conspirator enlisted false alibi witnesses, concealed weapons, or fled in order to avoid apprehension. *State v. Cherry, supra,* 289 *N.J.Super.* at 523–24, 674 *A.*2d 589. Moreover, statements relating to past events may be admissible if they are "in furtherance" of the conspiracy and "serve some current purpose, such as to provide cohesiveness, provide reassurances to a co-conspirator, or prompt one not a member of the conspiracy to respond in a way that furthers the goals of the conspiracy." *State v. Taccetta,* 301 *N.J.Super.* 227, 253, 693 *A.*2d 1229 (App.Div.1997).

The trial court must make a preliminary determination of whether there is independent proof of the conspiracy. *N.J.R.E.* 104(b). Specifically, the trial court must determine whether there is independent evidence "substantial enough to engender a strong belief in the existence of the conspiracy and of [the] defendant's participation." *Phelps, supra,* 96 *N.J.* at 519, 476 *A.*2d 1199. The requisite independent evidence may take many different forms, "such as books and records, testimony of witnesses, or other relevant evidence. There may be a combination of different types of proof." *Id.* at 511, 476 *A.*2d 1199. Thus, if the hearsay evidence is corroborated with sufficient independent evidence that engenders a strong sense of its inherent trustworthiness, it is admissible under the co-conspirator exception.

 Sherron argues that the trial court erred when it found independent evidence that a conspiracy existed. In ruling as it did, the court turned to Sherron's own statement to Detective Eutsey in which he repeatedly used the term "we" to describe the events leading to the beating death of Watkins:

> All right, counsel, I have in front of me the statement. And referring to the statement, first page, "[Watkins] spent the night at the house and in the morning Terrell found his ring was missing. He called me to ask if I had seen it. Then he asked me to come back—to come help him look. After *we didn't find it,* I left. I went to the store and got a pack of cigarettes. Then he asked me to take a ride with him when he came out of the building. *We went to a friend's house to get [Watkins].* Then he got in the car. *We drove back to the building,* then went back up there to get the ring because [Watkins] left it there. After he admitted he stole it and needed the money. *We went back to the building* and took the elevator upstairs so *he* could beat his ass for stealing out of the house after he gave him somewhere to stay after his family turned their backs on him."

The court concluded that, based on Sherron's own statements, there was some commonality of purpose as evidenced by defendant's persistent use of the term "we." Sherron counters that his statement to the police does not constitute sufficiently substantial evidence "to engender a strong belief in the existence of the conspiracy and of defendant's participation," in conformance with *Phelps* and that his use of the term "we" merely indicates that he accompanied Terrell and that the commonality of purpose was to recover the ring.

We disagree. The trial court properly concluded that Sherron's statement constituted independent evidence that is substantial enough to comply with the standard set forth in *Phelps*. His knowledge of Terrell's intentions and his admitted participation in at least one kick supports that inference and justifies consideration of the admission of a co-conspirators statement.

 As noted earlier, when Baskerville testified, he disavowed his statement that Terrell had told him that he and Sherron took part in the beating death of Watkins. Over Sherron's objection, Detective Eutsey was permitted to read Baskerville's entire state-

ment to the jury as a prior inconsistent statement.[1] At that time, Sherron argued that Baskerville's statement should be redacted to exclude declarations made by Terrell after the beating of Watkins had occurred. Specifically, Sherron took issue with the following statements allegedly made by Terrell: (1) "They told me they beat [Watkins];" (2) "He said that he and [Watkins] were fighting and his brother [Sherron] and his friends bone rushed him and Terrell said he could not stop it;" and (3) "Yes, for humiliation. They took off his clothes and left him in the stairway to teach him a lesson."

As noted earlier, a conspiracy may continue beyond the actual commission of its objective if it is shown that a conspirator enlisted false alibi witnesses, concealed weapons, or fled to avoid apprehension. *State v. Cherry,* 289 *N.J.Super.* at 523, 674 *A.*2d 589. Likewise, statements relating to past events are made in furtherance of the conspiracy if they serve some current conspiratorial purpose as in, for example, *Taccetta, supra,* 301 *N.J.Super.* at 253, 693 *A.*2d 1229.

Here, the State argues that Terrell had the objective to avoid detection because Terrell called Baskerville around noon on the day of Watkins' death and asked to meet him at Long's auto body shop due to the large police presence at Terrell's apartment building. Shortly after that call, Terrell came to Baskerville's house and told him: "yo, man, I don't think that cat was breathing; I hope he ain't dead." In Baskerville's statement to the police, he said that Terrell asked him to go to the hospital but that

---

1 *N.J.R.E.* 803(a)(1) provides that prior statements made by a testifying witness, that would have been admissible if made by the declarant while testifying and that are inconsistent with his testimony at trial are admissible if the prior statement is contained in a writing signed by the witness in circumstances establishing its reliability. *N.J.R.E.* 803(a)(1). Here, because Baskerville disavowed his statement to the police at trial, it was admissible under *N.J.R.E.* 803(a)(1) to the extent that it did not contain otherwise inadmissible evidence. The portions of Baskerville's statement relating what Terrell told him that inculpated Sherron had to be independently admissible under the co-conspirator exception. *N.J.R.E.* 803(b)(5).

he refused to do so or to become involved. In his statement and at trial, Baskerville maintained that he later went the hospital with Alston to check for himself on Watkins' condition. It was then that he ascertained that Watkins was dead.

It was not until later that evening, around 8:30 or 9:00 p.m., that Terrell returned to Baskerville's house, apparently still under the impression that Baskerville had not gone to the hospital. When he found out Watkins was dead, he made the three challenged statements about the circumstances surrounding the beating death of Watkins. At that point, there was simply nothing in the record to indicate that Terrell was attempting to enlist a false alibi witness, conceal incriminating evidence, provide reassurance to a co-conspirator, otherwise obtain Baskerville's aid in furtherance of the conspiracy, or flee in order to avoid apprehension. Therefore, the portion of Baskerville's statement containing the declarations made by Terrell in the evening hours was inadmissible against Sherron under the co-conspirator exception to the hearsay rule because the statements do not appear to have been made during and in furtherance of the conspiracy.

 Sherron also contends that the trial court erred in admitting Terrell's statement to Long, "we beat him up and I think he is dead." However, the State points to Terrell's statement to Long in which he requested that Long cover for him as a continuance of the conspiracy. Based on Long's testimony, it can be inferred that Terrell was attempting to enlist a false alibi witness as well as to avoid apprehension when they spoke. Because the criminal enterprise continued to be carried out when Terrell solicited Long's help in avoiding apprehension, the trial court did not err by admitting that portion of Long's testimony.

Obviously, if the evidence at the new trial differs from what was adduced on this record, the trial court will be required to evaluate it in light of the principles to which we have adverted and determine the applicability of *N.J.R.E.* 803(B)(5).

## VI.

The judgment of the Appellate Division is reversed. The matter is remanded for further proceedings consonant with this opinion.

*For reversing and remanding*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, LaVECCHIA, and ZAZZALI—6.

*Opposed*—None.