NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5173-14T3

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

SAMUEL K. DAVIS, a/k/a
KEVIN S. DAVIS,

 Defendant-Appellant.
_________________________

 Submitted June 6, 2017 — Decided July 18, 2017

 Before Judges Koblitz and Rothstadt.

 On appeal from Superior Court of New Jersey,
 Law Division, Gloucester County, Indictment
 No. 12-12-1189.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Alyssa Aiello, Assistant Deputy
 Public Defender, of counsel and on the
 briefs).

 Sean F. Dalton, Gloucester County Prosecutor,
 attorney for respondent (Joseph H. Enos, Jr.,
 Senior Assistant Prosecutor, on the brief).

PER CURIAM
 Defendant Samuel K. Davis appeals from his May 22, 2015

judgment of conviction after a jury convicted him of the first-

degree crime of aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1),

of an elderly woman in her home. He was acquitted of murder and

weapons charges in connection with the crime. Because the jury

question as to whether mere presence at the scene was sufficient

was not answered properly, we reverse and remand for a new trial.

 Defendant was indicted for first-degree murder, N.J.S.A.

2C:11-3(a)(1) and (2); third-degree possession of a golf club for

an unlawful purpose, N.J.S.A. 2C:39-4(d); second-degree assault,

N.J.S.A. 2C:12-1(b)(1); third-degree possession of a knife for an

unlawful purpose, N.J.S.A. 2C:39-4(d); fourth-degree unlawful

possession of a golf club, N.J.S.A. 2C:39-5(d); and fourth-degree

unlawful possession of a knife, N.J.S.A. 2c:39-5(d).

 The charges stem from the killing of seventy-nine-year-old

Thirza Sweeten on March 18, 2012. The trial testimony revealed

the following facts. Sweeten's daughter, Ms. Montalto, who lived

nearby, checked on her mother, discovering the back door ajar

before finding Sweeten's body.

 Montalto testified that her brother Barry lived with their

mother in the home, but had been in the hospital at the time of

her death. Barry had a history of drug abuse and had people

"com[ing] in and out" of the house.

 2 A-5173-14T3
 Ms. Burgos was Sweeten's friend and had visited Sweeten the

night of her death around 10:15 p.m. to ensure the elderly woman

had taken her medication. While Burgos was visiting with Sweeten,

Burgos heard a "thump" from Barry's room. Burgos went into Barry's

room, but did not initially see anything. She remained there to

make a phone call, and then heard the bedroom window slide open

and saw defendant through the window. According to Burgos, she

told defendant "What the F are you doing? Barry's not here. He's

at the hospital." Defendant left and she then closed the window

and pulled the window's safety tabs to ensure the window could not

be raised more than a couple of inches.

 Defendant's presence at the window "creeped [Burgos] out"

because she did not know it was common for him come to the window

when he was looking for Barry. Barry explained that he frequently

let defendant and his other friends in and out through his bedroom

window.1 One print taken from the outside of Barry's window

matched defendant.

 Nicholas Schock, a detective with the Gloucester County

Prosecutor's Office, conducted a "walk through" of the scene. He

observed Sweeten lying on her back in the doorway between the

front bedroom and the living room with her shirt and bra pulled

1
 Montalto's husband, Derrick, confirmed it was a common practice
for visitors to tap on the living room window to get Sweeten's
attention and to tap on Barry's window to get Barry's attention.
 3 A-5173-14T3
up, exposing her stomach and breasts. There was evidence of trauma

to Sweeten's head, chest, hands, and neck. The detective also

noticed a broken phone cord in the living room and a golf club,

which had blood on it. There was a notepad in the living room

that had "drugger Kevin" scrawled on it.

 According to the medical examiner, Sweeten had two stab wounds

in her chest, an injury to her neck that was consistent with

strangulation with a cord, and a three-inch laceration on her head

that was consistent with being struck with a golf club. Although

the precise cause of death was unknown, the medical examiner

testified that either the stab wounds or the blunt force trauma

to Sweeten's head and neck could have caused her death.

 Detective Schock "documented" evidence at the scene – like

the phone cord, golf club, and notepad – but did not collect those

items until after he returned from the morgue later that evening.

Schock collected Sweeten's clothing at the morgue. He brought the

victim's clothing back to her home.

 The following morning, Schock returned to Sweeten's home to

assist investigators in searching for additional evidence. During

this visit, the following items were collected: a broken knife

found on a kitchen chair; a pink plastic bag used to package drugs,

which was found in the living room; beer, soda, and liquor bottles;

cigarette butts; and dried blood scrapings from a kitchen chair.

 4 A-5173-14T3
 Schock left Sweeten's home and returned to the prosecutor's

office, where defendant was being interviewed, in order to collect

defendant's clothing. While photographing defendant's clothing

the following day, Schock noticed stains on the inside of the rear

waistband of defendant's pants, which testing indicated was blood.

 The day after the killing, defendant provided an extensive

statement to the police denying his involvement in Sweeten's death.

Defendant stated he did not have a permanent residence and

occasionally slept in one of the junk cars parked in Conrad

Campbell's yard. According to defendant, Campbell also

occasionally employed defendant for odd jobs.2

 Defendant initially told the police that he went to sleep

early around 9:00 p.m. on the evening of March 18, 2012, but when

confronted with the fact that someone had seen him near Barry's

house around 11:00 p.m., defendant explained he had in fact been

at Marlene Waller's house. Defendant further explained he did not

want to admit where he was because he and Waller "got high"

together and he did not want to be a "snitch." He said he left

Waller's house around 11:30 p.m. Waller told him to return around

midnight. Defendant returned then, but Waller refused to let him

inside. Waller later testified that she refused to let him inside

2
 Campbell had known defendant for more than thirty years, and
never had any problems with him, testifying defendant was "a good
worker."
 5 A-5173-14T3
because her boyfriend was about to come home. After defendant was

denied entry into Waller's home, he went to sleep in the truck

that was in Campbell's yard.

 Defendant explained to the police that he knew Barry because

he and Barry were both "drug runners," although they worked for

different people, and they occasionally would "get high" together.

Defendant also explained he knew Sweeten because she was home when

he visited Barry. He stated the last time he saw Barry was two

weeks before, when Sweeten told him Barry had a heart-attack and

was in the hospital. She told defendant not to come around

anymore. Defendant denied involvement in Sweeten's murder, but

did insinuate that another one of Barry's associates from his drug

running could have had something to do with it.

 The cigarette butts, pink plastic bag, broken knife, blood

scraping from the kitchen chair and bottles were not forensically

tested. Sweeten's clothing, Davis' clothing, the golf club, the

phone cord, hair fragments found on the victim and the sexual

assault kit were submitted for forensic analysis. The evidence

was examined by a trace evidence examiner and a forensic

serologist, both from the New Jersey State Police Office of

Forensic Sciences. Defendant was not identified as the source of

the hair fragments. No textile fibers transferred between

 6 A-5173-14T3
defendant's clothing and Sweeten's clothing, the samples taken

from the sexual assault kit, the golf club, or the telephone cord.

 The forensic serologist collected a saliva sample from

Sweeten's bra, a blood sample from the head of the golf club, and

two blood samples from defendant's clothing, one from a bloodstain

on the left thigh of defendant's pants and another from the lower,

right front of defendant's shirt. She also swabbed the golf club

and phone cord for skin cells. She found no evidence of a sexual

assault.

 Another expert from the New Jersey State Police Laboratory

conducted a DNA analysis on the blood, saliva samples, and skin

cell samples. The expert identified Sweeten as the source of the

major DNA profile on the blood found on the golf club. The expert

also identified Sweeten as a possible contributor to the DNA

profile for the skin cells that were found on the golf club handle,

and was able to conclude defendant was not a contributor to the

DNA profile. Samples from the phone cord revealed two DNA

profiles: one from Sweeten and one from an unidentified male who

was not defendant. Two DNA profiles were found on the blood sample

from defendant's pants: Sweeten was the source of the major DNA

profile and defendant the minor DNA profile. The expert was unable

to identify the source of the mixed DNA profile obtained from

defendant's shirt.

 7 A-5173-14T3
 In defense counsel's summation, he argued defendant was

truthful in his statement to law enforcement. He also argued

defendant was not the assailant because his DNA was conclusively

excluded from the DNA samples taken from the golf club and the

phone cord. As for the bloodstain on defendant's pants, counsel

explained that the blood could have stained the pants by cross-

contamination during evidence collection. The detective did not

initially notice the blood on the pant-leg, although noticing a

spot on the waistband that was not tested. Counsel argued that

if defendant had been the killer, more than a stain of Sweeten's

blood would have been found on defendant's clothing, given the

type of blunt force trauma she experienced. Moreover, counsel

argued defendant had no motive for the crime – it was not a robbery

and there was no evidence of sexual assault.

 The day after the jury began deliberating, it sent the trial

court a note asking, "Do charges include the suspect's presence

at the time of the crime, without placing the weapon in his hand?"

The court interpreted the question to mean defendant "was there,

[but] someone else did it[.] Someone else had the weapon and

struck the blows." Defense counsel urged the court to respond

that "mere presence at or near the scene does not make a person a

participant in the crime; nor, does the failure of a spectator to

interfere make him or her a participant in the crime" and that

 8 A-5173-14T3
"[i]t depends upon the totality of circumstances that appear from

the evidence." The State objected, reasoning that defense

counsel's instructions came from the charge for accomplice

liability and defendant was neither charged as an accomplice nor

was his defense that he was an accomplice.

 While the court and counsel conferred on the response to the

jury, the jury sent another note asking if they would get a break

for lunch as they were getting hungry. Before sending the jury

for lunch, the court delivered its response to the jury's question.

The court acknowledged that it could not comment on the evidence

but "reminded [the jury] that the State bears the burden of proof

to prove each and every essential element of the crimes charged,

in each count, beyond a reasonable doubt." The court also stated

that the jury "must determine . . . whether the crimes charged in

the Indictment were committed by the defendant." The court did

not reread the charge, but encouraged the jurors to review the

copy of the charge that had been provided to them.

 After returning from lunch, the jury returned its verdict,

finding defendant guilty of aggravated manslaughter, a lesser-

included offense of murder, and acquitting defendant of all other

charges including possession of the golf club, the weapon recovered

 9 A-5173-14T3
at the scene covered in blood. The court sentenced defendant to

prison for life without parole.3

 On appeal defendant raised the following points:

 POINT I: THE JURY'S QUESTION INDICATED THAT
 THE JURY DID NOT KNOW HOW TO DETERMINE GUILT
 OR INNOCENCE IF IT CONCLUDED THAT DAVIS WAS
 PRESENT AT THE SCENE OF THE HOMICIDE BUT DID
 NOT CAUSE THE VICTIM'S DEATH BY HIS OWN
 CONDUCT. THE JUDGE'S RESPONSE, WHICH SIMPLY
 REITERATED, IN GENERAL AND ABSTRACT TERMS,
 WHAT THE BURDEN OF PROOF IS IN A CRIMINAL CASE,
 FAILED TO PROVIDE THE JURY WITH THE GUIDANCE
 IT NEEDED TO PROPERLY REACH A VERDICT ON THE
 HOMICIDE COUNT.

 POINT II: THE TRIAL COURT ABUSED ITS
 DISCRETION BY SENTENCING DAVIS TO LIFE IN
 PRISON. IN THE ALTERNATIVE, THE COURT ERRED
 IN ORDERING DAVIS TO SERVE HIS SENTENCE
 WITHOUT THE POSSIBILITY OF PAROLE BECAUSE LIFE
 WITHOUT PAROLE IS NOT A PERMISSIBLE SENTENCE
 UNDER N.J.S.A. 2C:44-3A.

 On appeal, defendant takes issue with the trial court's

instruction after the jury asked a question inferring defendant

was at the scene but did not cause the victim's death. Quoting

State v. Middleton, 299 N.J. Super. 22, 30 (App. Div. 1997),

defendant argues a "trial court must respond substantively to

questions asked by the jury during deliberations." While defendant

3
 This sentence, imposed as a discretionary extended term, is not
statutorily authorized. N.J.S.A. 2C:43-7(a)(1). Defendant was
eligible for a life term under the No Early Release Act, N.J.S.A.
2C:43-7.2(d)(2) (NERA). NERA explains "a sentence of life
imprisonment shall be deemed to be 75 years." N.J.S.A. 2C:43-
7.2(b). Life without parole is not authorized.
 10 A-5173-14T3
acknowledged the court did not have to read his proposed

instruction on "mere presence," it "needed, at a minimum, to

forcefully convey to the jury that [defendant] could not be found

guilty of murder or any lesser homicide offense unless it was

convinced that Sweeten's death was caused by [defendant's] own

conduct and not by the conduct of another."

 "'[W]hen a jury requests a clarification,' the trial court

'is obligated to clear the confusion.'" State v. Savage, 172 N.J.

374, 394 (2002) (quoting State v. Conway, 193 N.J. Super. 133, 157

(App. Div.), certif. denied, 97 N.J. 650 (1984)). "[T]he trial

judge is obliged to answer jury questions posed during the course

of deliberations clearly and accurately and in a manner designed

to clear its confusion, which ordinarily requires explanation

beyond rereading the original charge. The court's failure to do

so may require reversal." Pressler & Verniero, Current N.J. Court

Rules, comment 7 on R. 1:8-7 (2017). Our Supreme Court recently

held in similar circumstances, where the defendant was not charged

as an accomplice nor was the accomplice liability instruction

given to the jury, that a "mere presence" instruction should have

been provided to the jury. State v. Randolph, __ N.J. __, __

(2017) (slip op. at 3). In Randolph defendant was found hiding

in an apartment above the apartment where the drugs were found

that formed the bases for the criminal possession charges. Id.

 11 A-5173-14T3
at 5-7. The Court stated, "the better course would have been to

give the charge to disabuse the jury of any possible notion that

a conviction could be based solely on defendant's presence in the

building." Id. at 31.

 Here, defendant was not convicted of possession of the murder

weapon, nor was forensic evidence presented linking him to the

bloody golf club or the phone cord. Another male's DNA was found

on the phone cord. The jury asked a question which the court

interpreted to mean defendant "was there, [but] someone else did

it[.] Someone else had the weapon and struck the blows." Rather

than answering that question directly as defendant requested, the

court repeated basic jury charges regarding the State's burden of

proof and told the jury to reread the other charges, none of which

included the answer to their question:

 Mere presence at or near the scene does not
 make one a participant in the crime, nor does
 the failure of a spectator to interfere make
 him/her a participant in the crime. It is,
 however, a circumstance to be considered with
 the other evidence.

 [Model Jury Charge (Criminal), "Liability for
 Another's Conduct" (N.J.S.A. 2C:2-6) (May
 1995).]

 In Randolph, in light of the charges given on joint and

constructive possession, the Court found the error harmless.

Randolph, supra, slip op. at 3, 31. Considering the jury's

specific question and its verdict, we cannot find the failure to

 12 A-5173-14T3
answer the jury's question harmless, especially as the evidence

tying defendant to the crime was not overwhelming.

 Reversed and remanded for a new trial on the charge of

aggravated manslaughter. We do not retain jurisdiction.

 13 A-5173-14T3