999 A.2d 1212

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. JESSE BELLIARD, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued September 15, 2009—Decided August 5, 2010.

58

Before Judges CARCHMAN, PARRILLO and ASHRAFI.

*Steven D. Altman* argued the cause for appellant (*Benedict & Altman,* attorneys; *Philip Nettl and Mr. Altman,* on the brief).

*Simon Louis Rosenbach,* Assistant Prosecutor, argued the cause for respondent (*Bruce J. Kaplan,* Middlesex County Prosecutor, attorney; *Mr. Rosenbach,* of counsel and on the brief).

The opinion of the court was delivered by

CARCHMAN, P.J.A.D.

Defendant Jesse Belliard appeals from an August 17, 2007 judgment of conviction for first-degree robbery, *N.J.S.A.* 2C:15–1; first-degree felony murder, *N.J.S.A.* 2C:11–3(a)(3); and aggravated manslaughter, *N.J.S.A.* 2C:11–4(a). Defendant now asserts that the trial judge committed a number of errors, which prejudiced defendant's right to a fair trial. We agree that the judge erred as to the charge on causation and conclude that the error was sufficient to warrant a new trial as to the felony murder conviction. Accordingly, we reverse and remand for a new trial on that charge. As to the other convictions, we affirm.

On February 26, 2006, at approximately 12:30 a.m., Alejandro Morales and Francisco Urbina Serrano were walking down Hale Street in New Brunswick. Several people were standing in front of 175 Hale Street, and one of the individuals approached Serrano, asking for a cigarette. Serrano was, at that time, standing between two houses, in front of an alley and four concrete steps that led to a concrete walkway below. The vertical drop of the steps was approximately thirty-three inches.

While Serrano was standing in front of the alley, another individual, later identified as defendant, held Serrano by the shirt, struck him and pushed him down the steps into the alley. Defendant fled immediately thereafter. Other witnesses stated, however, that a group of people were involved in beating Serrano both before and after he fell down the steps.

New Brunswick police officers William Contreras and Ronnie Cheng arrived at Hale Street only a minute or two after the incident. At that time, Serrano was "laying in his son's lap . . . and . . . was unresponsive. . . ." Morales provided officer Contreras with a physical description of the assailants, and Contreras communicated the information over the police radio.

The police also identified two witnesses to the assault—Stephanie Contreras and Eleidie Torres. Torres was interviewed at 8:03 a.m. and at 9:45 p.m. on February 26th, and she stated that when she and Contreras arrived on Hale Street, prior to the incident, defendant told the girls to get out of the area because "[t]hey had to handle some business." Torres further stated that she saw defendant strike Serrano in the face, and Serrano fell down the steps. Contreras was interviewed at 11:36 p.m. on February 26th, and she stated that she saw defendant "holding the guy from the shirt. And they . . . was right on the first stair." Defendant then "hit him in the stomach, turned him around and, to the side," and pushed him down the steps.

Five police officers—three investigators and two uniformed officers—went to defendant's home to speak with him about the crime. The police officers explained to defendant, who was seventeen years old, and defendant's mother, Judy Tajada, "what was going on[,]" and defendant and his mother were taken to the police station in two separate cars. Defendant was not placed in handcuffs and was not under arrest.

When defendant arrived at the police station, he was interviewed by Sergeant Investigator Ivan Scott, Detective Rodney Blount and Detective Daniel Dominguez, to translate for defendant's mother. At the beginning of the interview and prior to

defendant being read his *Miranda* [1] rights, Judy Tajada wanted to know what had happened. The police did not answer her question, but stated, "we'll go through everything, there's some stuff I [got to] do first anyway so, we'll, we'll go through it." The detectives then informed defendant and his mother of defendant's *Miranda* rights, and defendant and his mother waived their rights. At no point during the interview was defendant told that he was under arrest.

Defendant then made the following statement:

Well I was with my, my boy and chillin' on the block whatever and a dude came up to me and told me that he wanted to rob somebody.

. . . .

Um, I know the guy but yea you know what I mean.

. . . .

And I didn't want any have any part with that.

. . . .

He kept insisting, insisting and I figured I was like whatever cause he was just gonna keep bothering me and he was, he was this Mexican cat, two Mexican cats. . . .

. . . .

. . . And whatever he's talking to me I'm like I don't wanna have any part with this, he keeps insisting whatever so I'm like whatever. All he wanted me to do was push one of the guys into a like, into his hands where like him and dude was alone. I did it, I don't what, whatever he did with that dude I don't know, then the other cat that was with him when I did that he looked at me funny and then he went up this porch, knocked on the window and that's when I took off, I ran.

Defendant described the person who incited the robbery as a Dominican man, Jesus Tejada. Defendant also stated, inconsistently, that he saw Serrano fall into the other person's arms, but then also stated that he did not see what happened when Serrano fell because he "wanted to watch [his] back [to] make sure the other dude didn't attack [him] . . . ."

While defendant gave his statement, Detective Dominguez translated the conversation to defendant's mother, and defendant asked, "Need help? Want me to tell her?" Detective Dominguez

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966).

replied, "No. Cause you could listen and I have no reason to lie." Nonetheless, defendant communicated to his mother throughout the interview in Spanish.

Also during the interview, defendant's mother stated that she "support[ed] everything [the police] are doing, if my kid is responsible for anything . . . he has to pay for what he did. . . . I'm not going to hide behind anything. . . . If he's responsible, if he's guilty, you have my permission to go." When the police were questioning the veracity of defendant's statements, defendant stated, "Yo like for real man, ya'll need to stop this cause I'm just about to stop saying, talking, whatever and ya'll can just lock me up to do whatever you got to do, like for real, I have no reason to lie to anyone."

As a result of the fall, Serrano suffered fractures on the right and left side of his skull, as well as the base of his skull. These caused severe brain hemorrhage and craniocerebral injuries, and Serrano died as a result of these injuries.

Following his being indicted, defendant filed a motion "to suppress [his] statement and all evidence derived from his illegal arrest." After the hearing, at which Sergeant Scott, Detective Selesky, Detective Blount, defendant's mother and defendant testified, the judge determined that it was "at least arguable that he was saying that he wanted to stop talking[,]" when defendant stated that the police could "lock [him] up." As a result, the police had a duty to "stop questioning him and to reconfirm that he was willing to speak to them and to readvise him of his Miranda rights, which they did not do[.]" Therefore, defendant's statements were admissible only up to that point in the interview. However, despite the *Miranda* violation, the judge determined that defendant's statements were given voluntarily, and the remainder of defendant's statements were available to impeach defendant's credibility if defendant was to testify at trial.

Defendant's trial was held in July and August 2007. At trial, the State first proffered Officer Contreras, and he testified to

Morales's account of the attack on Serrano. The State also played a videotape of defendant's redacted interview with Sergeant Scott.

Stephanie Contreras and Eleidie Torres also testified, but both stated that their earlier statements to the police were not true and that they were scared or coerced into making their statements implicating defendant. Contreras and Torres also claimed to be drunk on the night of February 26th. However, the State played an audiotape of Stephanie's interview with the police, as well as a redacted audiotape of Eleidie's statements to the police, which were admitted substantively, as prior inconsistent statements.

Defendant acknowledged pushing Serrano. His primary defense was that he had no intent to rob Serrano, and he "wanted nothing to do with the robbery," but "merely pushed and ran. . . ." Defendant's other defense was that "the injuries [to Serrano] occurred . . . after [defendant] had left the scene."

Defendant was found guilty of first-degree felony murder and second-degree robbery, but acquitted of first-degree robbery and aggravated manslaughter. Defendant filed a motion for a new trial, asserting that the judge should have suppressed defendant's entire statement to the police, that the judge did not correctly charge the jury and the judge erred in an evidentiary ruling. The judge denied defendant's motion.

The judge then merged defendant's robbery and felony murder convictions and sentenced defendant to a term of thirty years imprisonment, with thirty years parole ineligibility.

On appeal, defendant raises the following issues:

I. THE GUILTY VERDICTS FOR ROBBERY AND FELONY MURDER WERE AGAINST THE WEIGHT OF THE EVIDENCE, BECAUSE THE STATE PRESENTED NO EVIDENCE THAT DEFENDANT INTENDED TO COMMIT A THEFT (RAISED BELOW).

II. THE TRIAL COURT COST DEFENDANT A FAIR TRIAL BY OMITTING KEY LANGUAGE ON ATTEMPT AND CAUSATION FROM THE JURY INSTRUCTIONS (NOT RAISED BELOW).

A. THE COURT FAILED TO DEFINE "ATTEMPT" FOR THE JURY.

B. THE TRIAL COURT PROVIDED AN INCOMPLETE CHARGE ON CAUSATION.

III. THE TRIAL COURT'S RESPONSE TO THE JURY'S QUESTION ON CAUSATION UNFAIRLY PREJUDICED DEFENDANT, NECESSITATING A NEW TRIAL (RAISED BELOW).

IV. DEFENDANT'S CONVICTION FOR FELONY MURDER SHOULD BE REVERSED, BECAUSE UNDER THE CIRCUMSTANCES OF THIS CASE, HIS ACQUITTAL OF FIRST DEGREE ROBBERY PRECLUDED A CONVICTION FOR FELONY MURDER, DESPITE HIS CONVICTION FOR SECOND DEGREE ROBBERY (NOT RAISED BELOW).

V. THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING DEFENDANT'S REQUEST TO CHARGE THE JURY WITH AGGRAVATED ASSAULT AND SIMPLE ASSAULT AS LESSER INCLUDED OFFENSES TO ROBBERY (RAISED BELOW).

VI. THE TRIAL COURT ERRED IN ADMITTING DEFENDANT'S STATEMENT WHICH WAS THE PRODUCT OF AN ILLEGAL ARREST WITHOUT PROBABLE CAUSE, IN VIOLATION OF DEFENDANT'S RIGHT TO BE FREE FROM UNREASONABLE SEIZURES PURSUANT TO THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ART. I., ¶7 OF THE NEW JERSEY CONSTITUTION (RAISED BELOW).

 A. DEFENDANT WAS UNDER ARREST WHEN HE WAS REMOVED FROM HIS HOME.

 B. THE POLICE DID NOT HAVE PROBABLE CAUSE TO ARREST DEFENDANT.

VII. THE TRIAL COURT ERRED IN ADMITTING DEFENDANT'S STATEMENT WHICH WAS OBTAINED UNDER CIRCUMSTANCES THAT TAINTED ITS VOLUNTARINESS, IN VIOLATION OF DEFENDANT'S FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION (RAISED BELOW).

VIII. THE TRIAL COURT'S CANDID PREJUDGING OF THE TESTIMONY DURING THE MOTION TO SUPPRESS REASONABLY LED DEFENSE COUNSEL TO BELIEVE THAT THE COURT COULD NOT BE FAIR AND UNBIASED DURING THE HEARING, AND SHOULD HAVE PROMPTED THE COURT'S RECUSAL PURSUANT TO *R.* 1:12-1 (RAISED BELOW).

IX. NUMEROUS INSTANCES OF THE TRIAL COURT'S UNNECESSARY INTERVENTION IN THE PROCEEDINGS UNDERMINED THE DEFENSE AND COST DEFENDANT A FAIR TRIAL (PARTIALLY RAISED BELOW).

X. THE TRIAL COURT IMPROPERLY PREVENTED DEFENDANT FROM INTRODUCING EXCULPATORY HEARSAY STATEMENTS OF ALEJANDRO MORALES THAT HAD SIGNIFICANT INDICIA OF RELIABILITY (RAISED BELOW).

XI. THE CUMULATIVE ERRORS COST DEFENDANT A FAIR TRIAL.

XII. THE JUDGMENT OF CONVICTION IS ERRONEOUS.

## I.

Defendant argues that the judge's jury instructions "were fatally deficient because they were incomplete." Specifically, defendant claims that the judge failed to define "attempt" for the jury, and the judge provided an incomplete charge on causation. Defendant also argues that the judge erred in providing the jury with an "unreasonable example" of the felony murder affirmative defense. Defendant did not, however, object to the jury instructions at trial.

▮▮▮ Pursuant to *Rule* 1:7-2, a defendant is required to challenge instructions at the time of trial or else waives the right to contest the instructions on appeal. *See State v. Adams*, 194 *N.J.* 186, 206–07, 943 *A.*2d 851 (2008). "Where there is a failure to object, it may be presumed that the instructions were adequate." *State v. Morais*, 359 *N.J.Super.* 123, 134–35, 819 *A.*2d 424 (App. Div.2003) (citing *State v. Macon*, 57 *N.J.* 325, 333, 273 *A.*2d 1 (1971), *certif. denied*, 177 *N.J.* 572, 832 *A.*2d 322 (2003)). Therefore, we may reverse only in the presence of plain error, that is error "clearly capable of producing an unjust result." *Adams, supra*, 194 *N.J.* at 207, 943 *A.*2d 851 (citing *R.* 2:10–2). *See also State v. Martin*, 119 *N.J.* 2, 15, 573 *A.*2d 1359 (1990).

> As applied to a jury instruction, plain error requires demonstration of "legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." *State v. Hock*, 54 *N.J.* 526, 538 [257 *A.*2d 699] (1969), *cert. denied*, 399 *U.S.* 930, 90 *S.Ct.* 2254, 26 *L.Ed.*2d 797 (1970). The alleged error is viewed in the totality of the entire charge, not in isolation. *State v. DiFrisco*, 137 *N.J.* 434, 491 [645 *A.*2d 734] (1994). In addition, *any finding of plain error depends on an evaluation of the overall strength of the State's case. See State v. Cotto*, 182 *N.J.* 316, 326–27 [865 *A.*2d 660] (2005).
>
> [*State v. Nero*, 195 *N.J.* 397, 407, 949 *A.*2d 832 (2008) (emphasis added) (quoting *State v. Chapland*, 187 *N.J.* 275, 289, 901 *A.*2d 351 (2006)).]

▮▮▮ It is well-established that "[c]orrect charges are essential for a fair trial[,]" and to that end, "the court must explain the controlling legal principles and the questions the jury is to decide." *Martin, supra*, 119 *N.J.* at 15, 573 *A.*2d 1359. "Although a party

is not entitled to a charge in his own words, he is entitled to a charge which fully, clearly, and as accurately as possible sets forth the fundamental issues." *State v. Ball*, 268 *N.J.Super.* 72, 112, 632 *A.*2d 1222 (App.Div.1993) (citing *State v. LaBrutto*, 114 *N.J.* 187, 204, 553 *A.*2d 335 (1989); *State v. Green*, 86 *N.J.* 281, 288–89, 430 *A.*2d 914 (1981)), *aff'd*, 141 *N.J.* 142, 661 *A.*2d 251 (1995), *cert. denied*, 516 *U.S.* 1075, 116 *S.Ct.* 779, 133 *L.Ed.*2d 731 (1996). The jury charges must, therefore, "relate the law to the facts of a case. . . ." *State v. Savage*, 172 *N.J.* 374, 389, 799 *A.*2d 477 (2002). "[T]he test is to examine the charge in its entirety, to ascertain whether it is either ambiguous and misleading or fairly sets forth the controlling legal principles *relevant to the facts of the case.*" *LaBrutto, supra*, 114 *N.J.* at 204, 553 *A.*2d 335 (emphasis added).

With these principles in mind, we address defendant's claims.

▉ Defendant alleges that the judge erred by charging the jury with a truncated definition of causation with regard to felony murder.

At trial, one of defendant's main defenses was that defendant ran away after pushing Serrano, and a group of people started "kicking [Serrano], pounding him, taking his head and slamming it against the ground." The State Medical Examiner testified that Serrano suffered from at least two impacts about the skull. The Medical Examiner stated:

The second impact on the other side of the head could be caused by a scenario which really was just explained. He's down. He has one impact already. In order to get another impact on the other side of the head[,] obviously the other side of the head had to impact the pavement as well. Most likely scenario is he's down, he's lifted up, he's forcibly thrown down onto the pavement again.

. . . .

It's more likely that the right side injuries would be caused by him being accelerated from the top of the stairs to the bottom. This is much more distance that he's going to be able to travel during that fall being pushed and being the body would be accelerated and it struck the ground. . . .

. . . .

The injuries on the right side—the injuries created by the impact on the right side [were] enough to be lethal. The injuries created on the left side by themselves[,] although less severe[,] would still be enough to be lethal.

Defendant proffered the testimony of Dr. Paul Adler as an expert in emergency medicine. Dr. Adler testified that he did not disagree with the State's medical examiner, "in that two or more forceful or massive injuries could have caused" Serrano's injuries. These injuries could have been caused by "a baseball bat, . . . a brick, . . . a really forceful push down and then a massive punch to be honest." He also testified that a kick in the head by a "big, strong person with big hulking boots" could have caused defendant's injuries.

Victoria Velasquez, who had been looking out of the second floor window of an apartment with a view of Hale Street at approximately 12:30 a.m. on the night of the attack, also testified for the defense. She saw four men beating Serrano about the face, and one of the men beating Serrano was Ricardo Gonzalez, also known as Pato. She "only saw the guys r[u]n away and then he was there lying down . . . by the stairs on the sidewalk."

Erick Lezama, Velasquez's husband, who was with her in the second story apartment on the night of the attack, indicated that he saw three or four people assaulting one person, and he recognized Pato as one of the assailants. He stated that "they started hitting him [when] he was standing, then they push[ed] him in the hallways I guess he fell down and they kept beating him and then I only saw the four guys run away. . . ."

Notably, neither Morales, Lezama nor Velasquez identified defendant as one of Serrano's assailants.

The *Model Jury Charge (Criminal)*, Felony Murder, Non Slayer Participant (rev. Mar. 22, 2004), states, in pertinent part:

> The second element requires the State to establish that the victim's death was caused during the commission of or attempt to commit or flight after committing or attempting to commit the (insert predicate crime). In order to meet its burden of proof in this regard, the State must prove beyond a reasonable doubt the following:
>
> . . . .
>
> 2. That the victim's death was a probable consequence of the commission of or attempt to commit or flight after committing or attempting to commit (insert predicate crime). In order for the death to be a "probable consequence" of the (insert predicate crime) the death must not have been too remote, or too accidental

in its occurrence, *or too dependent on another's volitional acts* to have a just bearing on the defendant's liability or the gravity of his/her offense. In other words, you must decide if the State has proven beyond a reasonable doubt that, under all the circumstances, the death did not occur in such an unexpected or unusual manner that it would be unjust to find the defendant responsible for the death.

[ (Emphasis added).]

Here, however, the judge omitted the "another's volitional acts" language and charged the jury as follows:

The second element that the State must prove is that the victim's death was a probable consequence of the commission of the robbery.

So in order for a death to be a probabl[e] consequence it need not have been too remote or too accidental to have a just bearing on the defendant's liability or the gravity of the offense; in other words, you must decide if the State has proven beyond a reasonable doubt that under all the circumstances the death of Mr. Serrano did not occur in such an unexpected or unusual manner that it would be unjust or unfair to find the defendant responsible for that death.

During deliberations, the jury asked for "some clarification as to the concept of probable consequence of the robbery." The judge explained:

So this is a factual question for you to determine. The jury in this case must determine whether the death of Mr. Serrano was what we would call a probable consequence of this kind of a robbery—right?—and/or—or I should say, whether it was so unexpected and so unusual that it would be unfair to hold this defendant responsible for it.

I can't give you a better clarification in that, only—only to say to you that the spirit of the law requires the jury to look at all of the circumstances surrounding the alleged commission of the robbery—right?—and whether or not the death that flowed from that robbery, if you're satisfied beyond a reasonable doubt that the death did take place during the course of the robbery—right?—that that death was a probable consequence or that it was not so unexpected or so unusual that it would simply be unfair to hold one of the—you know, the alleged robbers responsible for the death as well. And again that's because the whole idea of felony murder is that one does not have to intentionally cause death to be responsible for a felony murder, one just has to be intentionally involved in the felony. Okay?

We find that the judge's omission constituted plain error.

A key factor in the defense was that a group of people were involved with beating Serrano, even after defendant pushed him down the steps. This is reflected in Velasquez's and Lezama's testimony and the medical corroboration by Dr. Adler. The jury might have determined, based on defendant's statement to the

police, that defendant pushed Serrano down the steps and ran away, and immediately subsequent to defendant's acts, a group of people, not part of the robbery plan, attacked Serrano and inflicted the fatal blows upon him. The record is devoid of any evidence indicating that defendant's intent was to act in concert with a group of people in the commission of a robbery.

As we have noted, the jury charge must "fairly set[ ] forth the controlling legal principles *relevant to the facts of the case* [,]" *LaBrutto, supra,* 114 *N.J.* at 204, 553 *A.*2d 335 (emphasis added), and the judge must "relate the law to the facts of a case...." *Savage, supra,* 172 *N.J.* at 389, 799 *A.*2d 477. Here, the jury charge did not address the possibility that volitional acts by other persons could break the causal chain, which linked defendant to Serrano's murder, despite the inclusion of such instructions in the Model Jury Charge. *See Martin, supra,* 119 *N.J.* at 32, 573 *A.*2d 1359 ("The court should instruct the jury that the defendant, whether a sole perpetrator or an accomplice, is liable for felony murder only if the death is not too remote, accidental in its occurrence, or too dependent on another's volitional act to have a just bearing on the defendant's culpability.").

Although the judge instructed the jury that it may not find defendant guilty if "the death of Mr. Serrano occur[red] in ... an unexpected or unusual manner," the judge should have instructed the jury specifically regarding the effect of volitional acts by third parties, which may break the causal chain. The judge's instructions were generally correct but were not specifically tailored to address one of defendant's principal defenses. Moreover, "clearly erroneous instructions usually are considered poor candidates for rehabilitation under the harmless error philosophy." *State v. Feaster,* 156 *N.J.* 1, 45, 716 *A.*2d 395 (1998) (citation and quotation marks omitted).

The judge's omission may have led the jury to a result it would not have otherwise reached and was plain error. The jury charge was confusing as to the law of causation as it related to the facts of this case, and the judge failed to specifically instruct the jury as to

this critical issue. *See Martin, supra,* 119 *N.J.* at 32, 573 *A.*2d 1359.

 Although we find the judge erred in his causation charge, we also address defendant's contention regarding the jury charge as to "attempt" in the event of retrial. In pertinent part, *N.J.S.A.* 2C:5–1, Criminal Attempt, provides:

a. A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:

. . . .

(3) Purposely does . . . anything which, under the circumstances as a reasonable person would believe them to be, is an act . . . constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

b. Conduct which may be held substantial step under subsection a. (3). Conduct shall not be held to constitute a substantial step under subsection a. (3) of this section unless it is strongly corroborative of the actor's criminal purpose.

[*N.J.S.A.* 2C:5–1(a)(3), (b).]

"An attempt must be purposive; no lesser mental state will suffice." Cannel, *New Jersey Criminal Code Annotated,* comment 3 on *N.J.S.A.* 2C:5–1 (2010).

The State acknowledges that defendant's participation in the robbery "was limited to the attempt phase." The State was required to prove beyond a reasonable doubt that defendant attempted to aid the "dude" in the commission of the robbery. In charging the jury on robbery, the judge stated:

Now, the first crime that is charged in the indictment is the crime of robbery in the first degree and the law that this charge is based on is pretty straightforward. It says a person is guilty of robbery in the first degree if in the course of committing a theft he purposely inflicts serious bodily injury upon another. Okay?

So in order for you to find the defendant guilty of robbery in the first degree the State has to prove to you beyond a reasonable doubt that the defendant was in the course of committing a theft, and, two, that while in the course of committing a theft he purposely inflicted serious bodily injury upon Francisco Urbina Serrano.

So the first element that the State has to prove is that the defendant was in the course of committing a theft. Now, in this connection we say that someone is in the course of committing a theft if the act occurs in an attempt to commit the theft, during the commission of the theft or in an attempt or an immediate flight after the attempted commission. Okay? So in the course of committing a theft means in an attempt to commit the theft, during the commission of the theft and in the immediate flight after its attempted commission.

And theft is defined as the unlawful taking or exercise of unlawful control over the property of another with the purpose to deprive him thereof. Okay?

The judge did not define "attempt" for the jury, although the Model Jury Charge for first-degree robbery specifically instructs that "[i]f attempt is involved, [the judge must] define attempt." *Model Jury Charge (Criminal)*, Robbery in the First Degree (Rev. July 2, 2009). Consequently, the judge did not explain (1) that attempt requires purposeful acts ("purposeful conduct" element); (2) that defendant must have had the culpability otherwise required for commission of the crime ("culpability" element); nor, (3) as is pertinent to this case, that defendant must have taken a "substantial step" in the commission of the offense ("substantial step" element).

However, the judge also charged the jury regarding accomplice liability; he instructed:

Now, in order to be an accomplice under our law the State must prove each of the following elements beyond a reasonable doubt: Number one, the State must prove that it was the defendant's purpose to promote or facilitate the commission of the robbery ... of Francisco Urbina Serrano.

Okay. So the State must prove to start off that it was the defendant's purpose or conscious object to assist in the robbery of Francisco Serrano.... [T]he State must prove that the defendant possessed the same criminal state of mind that is required to be proved against the persons who actually committed the crimes.

. . . .

... [Y]ou must be satisfied beyond a reasonable doubt that he did have a conscious object or an intention to promote or facilitate or help out in the robbery and that he did in fact help out in the robbery.

In other words, the jury was instructed that it could not convict defendant unless it was convinced, beyond a reasonable doubt, that defendant's purpose was to aid another person rob Serrano and that defendant shared the same mental state as the "dude." Given this instruction, we find that the judge's failure to instruct the jury as to the "purposeful conduct" element and "culpability" element of attempt was harmless error, as the jury clearly determined that defendant possessed the required culpability and acted purposefully as an accomplice in the commission of the robbery.

 The accomplice charge does not, however, address the "substantial step" element of attempt. To satisfy this element, "the step taken must strongly show the defendant's criminal purpose. That is, the step taken must be substantial and not just a very remote preparatory act, and must show that the accused has a firmness of criminal purpose." *Model Jury Charge (Criminal)*, Attempt (Rev. June 15, 2009). "These steps may be mere preparation; only very remote preparatory acts cannot amount to an attempt. . . . [T]hat substantial additional steps were required for completion of the plan is irrelevant." Cannel, *supra*, comment 6 on *N.J.S.A.* 2C:5–1.

 The Supreme Court has noted that "there is an especially close link between the criminal-purpose and substantial-step requirements." *State v. Perez*, 177 *N.J.* 540, 554, 832 *A.*2d 303 (2003). We must consider "defendant's words and acts in tandem as part of the whole picture from which the jury could have drawn its inferences." *Ibid.* (holding, where defendant was convicted of attempt to commit child endangerment, that defendant's acts—including offering a thirteen-year old victim a ride and calling her to his car—amounted to a substantial step, especially where the "jurors were permitted to use common experience to interpret defendant's words [to the police] to determine his intent"). And as we have previously noted, any finding of plain error in the jury charge depends on an evaluation of the overall strength of the State's case. *See Cotto, supra,* 182 *N.J.* at 327, 865 *A.*2d 660.

Here, defendant stated that the plan was to push Serrano down into the alleyway so that the other individual could rob him. Defendant also acknowledged in his statement to the police, which defendant did not contradict at trial, that he pushed Serrano down the alley. Defendant only claimed that he lacked the required mental state, a defense which, as we have noted, the jury rejected.

Defendant, in effect, admitted to committing one of the elements of robbery—"[i]nflict[ing] bodily injury or us[ing] force upon another[,]" *N.J.S.A.* 2C:15–1(a)(1)—and the jury found that he did so as an accomplice, with the conscious object to assist in the robbery

of Serrano and with the requisite state of mind "that is required to be proved against the persons who actually committed the crimes." Defendant's undisputed conduct was unmistakably beyond the stage of mere preparation and was a substantial step in the commission of the offense, as planned by the other individual. Therefore, while the judge's failure to charge the jury with attempt was in error, this error was not sufficient to lead the jury to a result it would not have otherwise reached. *R.* 2:10–2.

We faced a similar issue in *State v. Gonzalez,* where we determined that the failure to define "attempt in the predicate offense of robbery, and its specific component, 'substantial step,' *N.J.S.A.* 2C:5–1 b, constitute[d] plain error." 318 *N.J.Super.* 527, 536, 723 *A.*2d 1278 (App.Div.), *certif. denied,* 161 *N.J.* 148, 735 *A.*2d 573 (1999), *abrogated on other grounds by State v. Hill,* 199 *N.J.* 545, 565–66, 974 *A.*2d 403 (2009). However, in that case, we determined that defendant's actual conduct in the commission of the attempted robbery was "simply unknown." *Id.* at 534, 723 *A.*2d 1278. There were several conflicting versions of the attempted robbery, and, based on defendant's inculpatory statement, defendant was arguably "attempting to commit a *theft* from the victim's person[ ]" when defendant commenced his criminal conduct. *Id.* at 535, 723 *A.*2d 1278 (emphasis added). Theft, however, is not a predicate offense for felony murder. *See N.J.S.A.* 2C:11–3(a)(3). It was largely because defendant's actions were unknown and may not have constituted attempted robbery that we held that the failure to charge the jury with attempt constituted plain error.

Here, as noted, the plan was for defendant to push Serrano down the alleyway steps so the other individual could be alone with Serrano and rob him, and defendant admitted pushing Serrano down the steps. This satisfied the force or bodily injury requirement for robbery, and defendant's conduct, by defendant's own admission, was a substantial step in the commission of the attempted robbery. It is irrelevant that the there were several more steps to be taken to complete the robbery; defendant's admitted conduct went beyond mere preparation.

■ Defendant further claims the judge committed an error in illustrating the affirmative defense to felony murder. After explaining the definition of "probable consequence," the judge then illustrated the affirmative defense:

> As an example, what if three or four men decided—had a plan that they were going to unlawfully enter an unoccupied store in the middle of the night and they had decided that there was not going to be any violence—right?—they were just going to commit a nighttime burglary in an unoccupied store. All right? And one person's role is to stay in the car and wait. No weapons are carried. Nobody talks about any violence. They don't expect to see anybody in that store. They go in the store and then there's a security guard there who ends up having a scuffle with one of the perpetrators dies from a heart attack let's say. The guy waiting in the car would assert this affirmative defense saying, number one, I had nothing to do with the act that caused the death; number two, I never dreamed anybody else was going to engage in any violence, nobody had a weapon, the plan was to commit a non-violent felony, and so even though there was a burglary and a death was caused during the burglary it's not fair to hold me responsible. Okay?
>
> . . . .
>
> And again, as I explained, all four of those factors have to be satisfied, that the defendant did not commit the homicidal act or in any way cause or aid in the commission. But what we mean by the homicidal act is the act that cause the death. Okay? So right off the bat in order to satisfy that affirmative defense the defendant—the State has to—the defendant has to satisfy that element which says that he did not commit the homicidal act or assist in the nature of the homicidal act.

Defendant now argues that "[t]his example gave the impression that ... there must be (a) a non-violent felony; (b) an explicit agreement to avoid violence; (c) a freakish death; and (d) defendant far removed from the action." Defendant also claims that the judge "confus[ed] the affirmative defense with the probable consequence test."

The felony murder statute delineates an affirmative defense for any prosecution wherein the defendant was not the only participant in the underlying crime and:

> (a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and
>
> (b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and
>
> (c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and

(d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

[*N.J.S.A.* 2C:11–3(a)(3).]

The judge's illustration did not conflate the affirmative defense with causation. The judge had already discussed the causation element of felony murder, and this illustration was only in reference to the affirmative defense.

While illustrations in jury charges can mislead, rather than help the jury, because they have a tendency to be too simplistic and to imply a too restricted understanding of the law, this illustration accurately conveyed the affirmative defense to the jury. The judge explained that defendant must not have "had nothing to do with the act that caused the death[,]" *N.J.S.A.* 2C:11–3(a)(3)(a); that defendant did not have a weapon," *N.J.S.A.* 2C:11–3(a)(3)(b); and the intent and preset plan was to commit a non-violent felony. *See N.J.S.A.* 2C:11–3(a)(3)(b). We find no error here.

## II.

Defendant next argues that his conviction for felony murder should be reversed because his acquittal of first degree robbery, aggravated manslaughter and reckless manslaughter compels the conclusion that the jury found that the causation element was not satisfied. Defendant did not raise this objection below, and so we analyze it under the plain error standard. *R.* 2:10–2.

We find there was no error, much less plain error, in the jury's verdict. The jury could have determined that defendant's acts did not rise to the level of recklessness, but defendant aided in the robbery by pushing Serrano down the steps. This is sufficient to overcome the affirmative defense, an element of which is that the defendant must not have "aid[ed] the commission" of the homicidal act.

## III.

 Defendant also claims that the judge committed reversible error by denying defendant's request to charge the jury with aggravated assault and simple assault as lesser included offenses to robbery. Defendant requested the simple assault charge at trial, and we must therefore determine whether there was a "rational basis" for the lesser-included charge. *N.J.S.A.* 2C:1–8(e). Defendant did not, however, request the aggravated assault charge, and we review the judge's conduct under plain error standard.

In *Cassady, supra,* the Supreme Court noted that " 'whether an included offense charge is appropriate requires (1) that the requested charge satisfy the definition of an included offense set forth in *N.J.S.A.* 2C:1–8(d), and (2) that there be a rational basis in the evidence to support a charge on that included offense.' " 198 *N.J.* at 178, 966 *A.*2d 473 (quoting *State v. Thomas,* 187 *N.J.* 119, 131, 900 *A.*2d 797 (2006)).

 However, when, as in this case, defendant requested a lesser-included offense charge, "whether the lesser offense is strictly 'included' in the greater offense . . . is less important . . . than whether the evidence presents a rational basis on which the jury could acquit the defendant of the greater charge and convict the defendant of the lesser." *State v. Brent,* 137 *N.J.* 107, 117, 644 *A.*2d 583 (1994); *see Cassady, supra,* 198 *N.J.* at 178, 966 *A.*2d 473. "[S]heer speculation does not constitute a rational basis." *Brent, supra,* 137 *N.J.* at 117, 644 *A.*2d 583. In *Cassady, supra,* for example, the Court found no rational basis to support defendant's requested theft charge as a lesser-included offense of robbery, where

defendant entered a bank; he spoke menacingly to a teller, demanding money; when the teller failed to hand over the money, defendant vaulted a bullet-proof glass partition, landing on the inside portion of the teller's counter where the teller stood in front of her cash drawer; defendant then began "pulling the [cash] drawer" where the teller stood and, fearing for her life, she fled; defendant took the money in the teller's drawer, jumped back over the bullet-proof glass partition, and escaped.

[198 *N.J.* at 178, 966 *A.*2d 473]

The Court concluded that "to claim that defendant's actions in this case merely constituted a theft improperly minimizes defendant's conduct and wrongfully belittles its import and consequences." *Id.* at 179, 966 *A.*2d 473.

There is no rational basis in the evidence to charge defendant with either aggravated or simple assault. Defendant stated, in his admission to the police, that he attacked Serrano because he was aiding in a robbery; no other explanation was offered at trial to explain defendant's conduct. Although defendant stated that he did not intend to partake in the ill-gotten gains of the robbery, he nonetheless admitted to pushing Serrano for the sole purpose of aiding in the commission of the robbery. Accordingly, to argue that defendant's conduct might have simply constituted assault or aggravated assault is to ignore the record developed at trial and speculate as to defendant's motives.

## IV.

Defendant next argues that the judge erred in admitting his statement to the police at trial, which he asserts was the product of an unlawful arrest without probable cause. We reject defendant's arguments.

We defer to the trial judge's factual findings so long as those findings are "supported by sufficient credible evidence in the record." *State v. Elders,* 192 *N.J.* 224, 243, 927 *A.*2d 1250 (2007) (citations omitted). We further owe deference to the trial judge's decisions "substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." *Id.* at 244, 927 *A.*2d 1250 (citations omitted). "A trial court's findings should be disturbed only if they are so clearly mistaken that the interests of justice demand intervention and correction." *Ibid.* (citations and quotations omitted). However, " '[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference.' " *Zabilowicz v. Kelsey,* 200 *N.J.* 507,

513, 984 *A.*2d 872 (2009) (quoting *Manalapan Realty, L.P. v. Twp. Comm.*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995)).

█ Defendant now claims that the police did not have probable cause to arrest him because the police relied upon Torres, who was a confidential informant. However, Torres was a *witness* to the crime, not a confidential informant. "A report by a concerned citizen ... generally has not been viewed with the same degree of suspicion that applies to a tip by a confidential informant." *Wildoner v. Borough of Ramsey*, 162 *N.J.* 375, 390, 744 *A.*2d 1146 (2000). When the witness is an "ordinary citizen[,] ... veracity is assumed." *State v. Stovall*, 170 *N.J.* 346, 362, 788 *A.*2d 746 (2002).

█ "For probable cause to arrest, there must be probable cause to believe that a crime has been committed and that the person sought to be arrested committed the offense." *State v. Chippero*, 201 *N.J.* 14, 28, 987 *A.*2d 555 (2009) (quotations and citations omitted). Probable cause has been defined as a "a well-grounded suspicion that a crime has been or is being committed." *State v. Pineiro*, 181 *N.J.* 13, 21, 853 *A.*2d 887 (2004) (citations and quotation marks omitted). "The substance of all the definitions of probable cause is a reasonable ground for belief of guilt." *Maryland v. Pringle*, 540 *U.S.* 366, 371, 124 *S.Ct.* 795, 800, 157 *L.Ed.*2d 769, 775 (2003) (internal editing marks omitted).

Pursuant to *Rule* 5:21–1, "[a] law enforcement officer may take into custody without process a juvenile who the officer has probable cause to believe is delinquent as defined by *N.J.S.A.* 2A:4A–23." *See State ex rel. J.M.*, 339 *N.J.Super.* 244, 249, 771 *A.*2d 651 (App.Div.2001). "Delinquency" is defined as "the commission of an act by a juvenile which if committed by an adult would constitute ... [a] crime." *N.J.S.A.* 2A:4A–23. Therefore, the issue is whether the police had probable cause to take defendant into custody.

There was substantial evidence in the record to support the conclusion that the State had probable cause to arrest defendant. The witnesses to the crime identified defendant as Serrano's

assailant, and this provided the police with sufficient probable cause to question defendant. Defendant and his mother were also informed of defendant's *Miranda* rights. Alternatively, the judge's conclusion, that defendant was not under arrest, was supported by sufficient credible evidence in the record, including the testimony of the officers who escorted defendant from his home to the police station.

In a related argument, defendant asserts that his statement was not voluntary because his mother "was effectively absent from the beginning of the proceedings," because she does not speak English and was not told "what happened" before defendant made incriminating statements.

When taking a juvenile into custody, "the detaining officers shall immediately notify the parents or guardians of the juvenile: 1. That the juvenile is being detained; 2. Where the juvenile is being held; and 3. The reasons that the juvenile is being detained." *N.J.A.C.* 13:94–2.3(a). A juvenile must be questioned in the "presence of the juvenile's parents or guardians, even if the juvenile waives the *Miranda* rights." *State in Interest of J.F.*, 286 *N.J.Super.* 89, 98, 668 *A.*2d 426 (App.Div.1995). The State must demonstrate that the totality of the circumstances establishes that the " 'accused's will was not overborne and that the confession was the product of a free choice.' " *Id.* at 98, 668 *A.*2d 426 (quoting *State in Interest of S.H.*, 61 *N.J.* 108, 114–16, 293 *A.*2d 181 (1972)). " '[T]he root of the inquiry is whether [the juvenile's] will has been overborne by police conduct.' " *State ex rel. Q.N.*, 179 *N.J.* 165, 172, 843 *A.*2d 1140 (2004) (quoting *State v. Presha*, 163 *N.J.* 304, 313, 748 *A.*2d 1108 (2000)).

Defendant claims that his statements were not voluntary because his mother was not informed of the reasons that defendant was being detained, and defendant was not permitted to speak to his mother. However, the record reflects otherwise.

The trial judge noted that

[T]his defendant is not a 14–year old child or a 15–year old child. The defendant was a 17–year old articulate individual who spoke English very well and based upon his demeanor with the officers was very, very calm and very—quite willing to speak and said that he knew why he was there. Okay? The police were courteous, they did not in any way coerce him, and indeed they very shortly thereafter did make the best efforts that they can make to advise Miss Tejada as to what was going on.

The judge further noted:

I'm also satisfied that his mother was present, they had made arrangements for her to be present, they made a good-faith effort to tell her, you know, what was going on, although they could have done it a little better and a little sooner, but I don't think that that fact negates the voluntariness under the totality of circumstances of his statement.

Again, we defer to the trial judge's factual findings when, as in this case, they are supported by sufficient credible evidence in the record. *See Elders, supra,* 192 *N.J.* at 243, 927 *A.*2d 1250.

Defendant spoke to his mother throughout the interview, and the police informed his mother, prior to coming to the police station, that defendant needed to be questioned. The entire interview was translated for defendant's mother as defendant spoke. She also unequivocally supported the police officer's questioning of her son. Although the police could have informed defendant's mother sooner, she was present in the room during the questioning and was unmistakably involved. There is no basis to disrupt the trial judge's findings that defendant's statements were made voluntarily.

## V.

Defendant next claims that the judge prejudged defendant's claims during his motion to suppress, which should have prompted the judge's recusal pursuant to *Rule* 1:12–1. Defendant also argues that the judge unnecessarily intervened in the proceedings and undermined defendant's defense, which prejudiced defendant's right to a fair trial. We address defendant's claims.

Defendant first asserts that he did not receive a fair hearing during his motion to suppress because the "trial court made determinations of disputed facts before hearing all of the

evidence." Specifically, at the suppression hearing, the issue was whether defendant was under arrest when removed from his parents' house; whether there was probable cause for the alleged arrest; and whether his statements were voluntary. Following the presentation of the State's witnesses, the judge indicated, off the record, that he was leaning toward finding that defendant was not under arrest, and that there was probable cause for the arrest.

Defendant objected to the judge's off-hand comments, and the judge stated:

And I've heard testimony now that convinces me that I've heard enough to make a ruling in the case. You don't even know what my ruling is because I haven't announced it fully yet, but I am satisfied that the one argument that you have made that there was no probable cause to arrest the defendant is simply without merit. *I've heard testimony that there was an eyewitness identification of the defendant by one witness and that other witnesses corroborated that this victim was, you know, assaulted and ultimately died, and I am satisfied that there was probable cause and there is nothing that Detective Blount can say that will change that.*

Now, you know, you have to put on the record whatever you think is appropriate, and I respect your right to do so, but the bottom line is I disagree with you that I am required to hear any and all witnesses that counsel choose to provide in oral argument when I've heard what I have—what I deem to be sufficient to resolve the motion that's before the Court and that's what I heard with respect to the one issue, so you could—frankly, I don't need—in my view I don't need to let you call this witness. You know, whether even you have oral argument is—is perhaps unnecessary in some cases, right? In this case you've been granted oral argument.

There were certain factual issues that had to get resolved by the Court and I am satisfied from the testimony of Sergeant Scott that there was probable cause. That's a legal conclusion, by the way, not a factual one completely, *but if you want to call Detective Blount because you think somehow that will clarify the record you're more than willing to do so.*

[ (Emphasis added).]

Defendant then presented his witnesses in support of the motion to suppress.

We conclude that the judge did not "prejudge" the merits of defendant's motion. The record reflects that the statements were made *after* hearing the State's witnesses, and at that point, the judge was presented with sufficient credible evidence to make a ruling on the motion. Moreover, defendant was not barred from presenting his own witnesses on the matter. Even if the judge's

statements were in error, defendant was not prejudiced, as defendant presented no compelling evidence to support his motion to suppress.

Defendant next asserts that the "trial court repeatedly intervened in the proceedings to the detriment of the appearance of impartiality." The first alleged instance of impartiality followed defendant's opening, wherein his counsel stated:

So when you're looking at all this evidence keep in mind that's an innocent man there until the State proves his guilt beyond a reasonable doubt, and they have to prove his guilt beyond a reasonable doubt of all the elements of these crimes that he's been charged with. That's what's required in a criminal case. It's the toughest standard, the hardest standard in our legal system, and it should be. *It should be especially in a case where a man, a young kid, is facing a murder charge. I don't have to tell you the consequence of a conviction on a murder charge,* so if there's any doubt and that doubt is reasonable you owe it to the oath you took on the Bible to find him not guilty.

[ (Emphasis added).]

After defense counsel completed his opening remarks, the judge stated:

Ladies and gentlemen, I did want to just mention to you at this point in time that in his opening [defense counsel] made some comments to you about the possible punishment or the impact that a conviction would have on the defendant. I want you to understand that under our law you are not to consider the issue of punishment. Under our law you must decide whether the State has proven the defendant's guilty of any of the charges beyond a reasonable doubt. All right? If you find the defendant not guilty of course that's the end of the case. If you find the defendant guilty of any charge it's the Court's responsibility under the law to determine what the appropriate punishment or consequence should be. So throughout this trial I'm going to ask you to focus on the evidence that you hear and relate it to the law that I explain to you and make your determination only as to whether the State has proven the defendant guilty of any of the crimes charged beyond a reasonable doubt. The issue of consequence or punishment is for the Court to decide so please keep that in mind.

[Defense counsel], I will ask you in future arguments to the jury not to raise those issues.

"New Jersey juries do not consider the punishments attendant to offenses in deciding guilt or innocence." *State v. Short,* 131 *N.J.* 47, 59–60, 618 *A.*2d 316 (1993) (citing *State v. Conforti,* 53 *N.J.* 239, 244–45, 250 *A.*2d 6 (1969) (noting that in making its determination, "the jury should not be influenced by a

consideration of what will be the result of its verdict, nor should its attention be distracted from its chief function") (quoting *State v. Bell*, 102 *N.J.Super.* 70, 75–76, 245 *A.2d* 370 (1968), *certif. denied*, 52 *N.J.* 485, 246 *A.2d* 447 (1968) (citations omitted))). Defense counsel's opening remarks were intended to sway the jury by having them consider the fact that defendant was a "young man," and that a conviction would have a severe impact on defendant's future. Defense counsel's remarks were in error, and the judge's correction was appropriate. The judge did not make " 'remarks that might prejudice a party or which are calculated to influence the minds of the jury.' " *D.G. ex rel. J.G. v. North Plainfield Bd. of Educ.*, 400 *N.J.Super.* 1, 25, 945 *A.2d* 707 (App.Div.) (quoting *Cestero v. Ferrara*, 110 *N.J.Super.* 264, 273, 265 *A.2d* 387 (App.Div.1970), *aff'd*, 57 *N.J.* 497, 273 *A.2d* 761 (1971)), *certif. denied*, 196 *N.J.* 346, 953 *A.2d* 764, *cert. denied*, —— *U.S.* ——, 129 *S.Ct.* 776, 172 *L.Ed.2d* 756 (2008).

 Defendant next argues that during the judge's final charge he made an unnecessary comment about defense counsel's closing. During defense counsel's closing he stated:

> Also finally I want to thank my client's family who have been in court here today, every day, have been supporting Jesse and myself throughout the beginning of this ordeal and I appreciate their trust and their faith in me.

The judge then made the following relevant comment in his jury instruction.

> [Y]ou may recall that [defense counsel] made some mention of the fact that the defendant has family members in court. That is none of your consideration. All right? You should not be influenced by anything that's happening in the court-room other than the presentation of evidence. That is extremely important. Many times during the course of a trial there are spectators in the courtroom that feel very strongly one way or another about the outcome of the trial. That should not in any way be considered by a jury. Okay? You consider this case based on the evidence and the law as I explain it to you and you should not be influenced by the fact that there are or there are not spectators in the courtroom. Just like I told you at the beginning of the case, avoid any media coverage, avoid any information about this case that doesn't come to you from the witness stand. So that's an important point of view.

This instruction was entirely appropriate. Defense counsel's comments were calculated to improperly garner jury sympathy by

noting that defendant had a supportive family. The judge was correct in instructing the jury that it may only consider facts presented in trial, not the presence of spectators in the courtroom.

Defendant also claims that the judge demonstrated bias by classifying certain of defendant's questions as "inappropriate," rather than "inadmissible" or "irrelevant." We have reviewed the two instances cited by defendant, and we conclude that defendant's arguments are insufficient to warrant extended discussion. *R.* 2:11–3(e)(2). However, we note the judge's comments were not prejudicial, and the judge, in one instance, rebuked the prosecutor for improper conduct. Moreover, we are satisfied that it was "the weight of the evidence, particularly the damning statements uttered by defendant himself, that led to [defendant's felony] murder conviction rather than the [judge]'s [allegedly] improper comments...." *State v. Timmendequas*, 161 *N.J.* 515, 596, 737 *A.*2d 55 (1999) (citations omitted).

 Defendant also claims that the judge committed prejudicial error when defendant cross-examined the State's medical examiner. During a lull in defense counsel's cross-examination, the following colloquy occurred:

THE COURT: [Defense counsel], while you're checking your notes I just have a question for Dr. DiCarlo, but you can check your notes.

Doctor, in forming your opinion did you consider whether the victim may have received the first blunt trauma injury by, you know, landing on the steps and then sort of bouncing off the steps and landing on the sidewalk for the second one? Did you consider that at all?

THE WITNESS: I thought of that scenario, but I ruled that—ruled that out because if he hit the steps and then the second injury was him just bouncing another foot or two the force in which he then hit the bottom of the steps would be considerable less and it would be more difficult to get these injuries.

Following the judge's question, defendant then continued with his cross-examination. Defendant did not object to the judge's question but now claims that this question prejudiced him because "the question may have influenced jurors to attach weight to that scenario." This argument is without merit.

 The Supreme Court recently recognized that "judges may question witnesses to clarify testimony, expedite a case, and otherwise protect the proceedings. But in exercising their discretionary power, judges must take care not to influence the jury by signaling doubt about a witness's credibility." *State v. Taffaro,* 195 *N.J.* 442, 445, 950 *A.*2d 860 (2008). Here, the judge asked a single question to the medical examiner, and defendant did not object to the judge's statements at the time of trial. Furthermore, defendant's case was strengthened by the medical examiner's answer, because it supported a finding that Serrano did not receive the second trauma as a result of the fall, but from some other impact.

We find no error here.

## VI.

 Finally, defendant argues that the judge erred by not permitting him to introduce testimony from Officer Contreras that Serrano's friend, Morales, identified someone other than defendant following the attack. Defendant sought to introduce Morales's statement as an exception to the rule against hearsay, either as a present sense impression or an excited utterance. According to defendant, Morales identified another individual, not defendant, as the person who struck Serrano and pushed him down the steps.

Officer Contreras arrived at the scene of the attack on Serrano within a minute after he was called and spoke to Morales "three to four minutes" after arriving at the scene. Contreras described Morales's behavior as "concerned and confused" and stated that he did not notice anything unusual about Morales.

The judge concluded that the officer's testimony as to Morales's statements was not covered by any hearsay exception. He noted:

[T]his is simply a case where a police officer responds to a scene conducting a preliminary investigation and then a witness provides a narrative statement to the police officer about what he perceived. Obviously, such a statement cannot be made admissible or in almost every criminal trial then there would be, you know, an attempt to allow this type of testimony without appropriate cross-examination.

He also concluded that there was no evidence that Morales was startled or that this statement was made immediately after perceiving the event. This statement was neither a present sense impression nor an excited utterance.

On appeal, defendant argues that this statement should have been admitted as an excited utterance. We review a trial judge's evidentiary determinations under an abuse of discretion standard, provided that the judge's rulings are not inconsistent with applicable law. *State v. Buda*, 195 *N.J.* 278, 294, 949 *A.*2d 761 (2008) (citing *Hisenaj v. Kuehner*, 194 *N.J.* 6, 12, 942 *A.*2d 769 (2008)); Pressler, *Current N.J. Court Rules*, comment 4.6 on *R.* 2:10–2 (2010). An abuse of discretion only arises on demonstration of "manifest error or injustice." *Hisenaj, supra*, 194 *N.J.* at 20, 942 *A.*2d 769 (citations omitted). An abuse of discretion occurs when the trial judge's "decision [was] made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." *United States v. Scurry*, 193 *N.J.* 492, 504, 940 *A.*2d 1164 (2008) (citations omitted).

"*N.J.R.E.* 803(c)(2) defines an excited utterance as 1) '[a] statement relating to a startling event or condition'; 2) 'made while the declarant was under the stress of excitement caused by the event or condition'; and 3) 'without opportunity to deliberate or fabricate.' " *State ex rel. J.A.*, 195 *N.J.* 324, 340, 949 *A.*2d 790 (2008). There are several pertinent factors to weigh in determining whether a statement was an excited utterance, including:

(1) the amount of time that transpired between the initial observation of the event and the subsequent declaration of the statement; (2) the circumstances of the event; (3) the mental or physical condition of the declarant; (4) the shock produced; (5) nature of the statement; and (6) whether the statement was made voluntarily or in response to a question.

[*Buda, supra*, 195 *N.J.* at 294, 949 *A.*2d 761 (citations omitted).]

In *J.A., supra*, for instance, the judge concluded that the "robbery of a woman who is knocked to the ground and whose purse is wrested from her as she cries out is clearly a 'startling event' under *N.J.R.E.* 803(c)(2), and that the witness's statement related to that event." 195 *N.J.* at 340, 949 *A.*2d 790. Furthermore, the

witness, who followed the attackers for a number of blocks and waited a few minutes before making a statement to the police, was without "opportunity to deliberate or fabricate." *Id.* at 340–41, 949 *A.*2d 790. However, there was no evidence of the witness's appearance or condition, such as whether he was in an anxious or calm state when relating the events, and it was an error for this judge to make an assumption that the witness would have been in an excited state after observing a robbery and pursuing the robbers. "[F]acts should have been elicited on the record to support such a finding." *Id.* at 341, 949 *A.*2d 790.

Nothing in the record supports the conclusion that Morales was "under the stress of excitement" when making his statements to Officer Contreras; rather, Morales appeared "concerned and confused." Furthermore, the trial judge concluded that too much time had passed between the time Morales witnessed the presumably exciting event and the time he made the statement—at least four to five minutes. We conclude that the judge's decision did not amount to an abuse of discretion.

## VII.

With regard to defendant's claims that cumulative errors prejudiced defendant's right to a fair trial, that the judgment of conviction is erroneous and that his conviction was against the weight of the evidence, we conclude that these arguments are without sufficient merit to warrant extended discussion. *R.* 2:11–3(e)(2).

Defendant's convictions for robbery and aggravated assault are affirmed. However, defendant's felony murder conviction is reversed, and the case is remanded for a new trial.