**NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4241-17T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

SALIK HINTON,

    Defendant-Appellant.

_____

> Argued January 6, 2020 – Decided January 31, 2020
>
> Before Judges Sabatino and Natali.
>
> On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 16-01-0179.
>
> Cody Tyler Mason, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Cody Tyler Mason, of counsel and on the briefs).
>
> Carey J. Huff, Assistant Prosecutor, argued the cause for respondent (Christopher J. Gramiccioni, Monmouth County Prosecutor, attorney; Carey J. Huff, of counsel and on the brief).

PER CURIAM

Tried by a jury, defendant Salik Hinton was convicted of second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count two); a second-degree "certain persons" not to possession weapons offense, N.J.S.A. 2C:39-7(b)(1) (count three); and third-degree possession of controlled dangerous substances ("CDS"), N.J.S.A. 2C:35-10(a)(1) (count one). The trial court sentenced defendant to concurrent sentences of an eight-year custodial term with a five-year disqualifier on count three, an eight-year custodial term with a forty-two-month parole disqualifier on count two, and a four-year custodial term on count one.

Defendant now appeals his convictions and sentence on various grounds. We affirm.

I.

A.

The events precipitating this case occurred on August 18, 2015 in Asbury Park. Sergeant Lorenzo Pettway, an officer of the local police department, was patrolling the Asbury Park Garden Apartment Complex.

Sergeant Pettway testified at a pretrial suppression hearing that he was a member of the police department's street crimes unit, "a small proactive unit set up . . . to investigate and arrest individuals engaging in various criminal

activities, including drug distribution, shootings, and gang activities" in Asbury Park. Part of the sergeant's role entailed "community policing," or establishing relationships with community residents so "they feel comfortable approaching us."

At the hearing, Pettway described the apartment complex location as a "high crime area," specifically noting there had been "numerous" arrests for shootings and drug distribution in the area and street gangs were in "control [of] different areas of the apartment complexes." There was an increased police patrol presence in the area on the night of August 18 because of a recent shooting. Defendant was not a suspect or otherwise implicated in that earlier shooting.

While on patrol, Pettway received information from a confidential source. The source apparently "flagged down" Pettway and, unsolicited, told him that "an individual only known by Salik was in the apartment complex, [and] was in possession of a handgun." Pettway stated he had a "history" with the confidential source and that he had provided Pettway with information that had proven "reliable in the past."[1] The source also provided a physical

---

[1] The source was a not a confidential "informant," meaning there was no formal cooperation agreement between the informant and the prosecutor's office or police department. A tip by a civilian source is generally considered more reliable than that of a confidential informant, and normally the veracity

description of "Salik:" a black male in his twenties, with a "heavy build," braids, and wearing a white t-shirt and orange shorts.

After receiving this information, Pettway immediately began to canvas the area seeking to corroborate it. The time was about midnight. Pettway drove in his patrol car to the corner of Jefferson Avenue and Atkins Avenue and saw three people, including defendant, standing in a grassy area on the corner. The sergeant recognized defendant as matching the physical description provided by the source.

Pettway was wearing a badge around his neck, jeans, and a "police shirt that says police across the front and Asbury Park Street Crimes Unit on the back." Although his car was unmarked, Pettway testified that "everyone knows it" and "it might as well be a marked police vehicle."

According to Pettway, he stopped his vehicle and "decided to approach" the persons. Defendant had his back turned to Pettway as he approached. The two other persons told defendant that a police officer was approaching, and defendant turned around to face Pettway. Pettway then recognized defendant from previous encounters in the complex.

_____

of the source is assumed. <u>State v. Belliard</u>, 415 N.J. Super. 51, 79 (App. Div. 2010); <u>see also</u> <u>State v. Stovall</u>, 170 N.J. 346, 362 (2002).

Pettway addressed defendant, initially saying, "Come here. Can I talk to you for a second?" According to Pettway, defendant began to walk away before he finished talking. "[A]s [defendant] was walking away, he started to reach towards his pockets."

Pettway followed defendant and addressed him a second time. The sergeant said, "Salik, come here. I just need to talk to you for a second." According to Pettway, defendant gave a "mumbled" response, and continued to walk away as Pettway followed. Then defendant began to run. Pettway estimated the entire encounter from his approach until defendant began to run lasted "a few seconds."

Pettway pursued defendant as he ran. The sergeant "believed [defendant] possibly had a gun" based on defendant's flight and his observed motion of reaching into his pockets as he ran.

As Pettway ran, he repeatedly yelled for defendant to "stop" and "stop running." The sergeant also radioed his location, a description of defendant, and the direction of pursuit to nearby officers.

After a chase estimated by Pettway to consume about two to three minutes, defendant tripped over a curb and fell to the ground in a parking lot. When he fell, Pettway saw objects fall out of defendant's right front pants pocket. There was "low lighting" in the area but it was not dark. Pettway

5

stated he could clearly see objects fall out of defendant's pocket from about twenty feet away. The sergeant did not immediately recognize the items when they fell out of defendant's pockets.

Sergeant Alistair Sweeney, another Asbury Park police officer, approached defendant from another direction. The two officers grabbed and handcuffed defendant. The officers then recovered a bag containing seven pills later identified as Percocet, a small semi-automatic handgun with five bullets in the magazine, and marijuana. Pettway testified the items were on the ground "not even a foot" away from where they detained defendant.

Defendant testified in his own defense at the suppression hearing. According to defendant, on the night of August 18, he was standing in the Vita Gardens area of the apartment complex with his cousins. He had been standing there for about "three or four minutes" when he saw Pettway get out of his car and approach. Defendant initially suggested he did not know the car or its driver, but then testified that he recognized Pettway as he approached the group.

Defendant asserted he did not want to talk with Pettway because the sergeant knew him and allegedly "always harassed [him] since he was a juvenile." Defendant later clarified that on previous occasions Pettway had stopped and arrested him.

6

Defendant stated that he ran because Pettway "kept coming behind" him as he walked away. He claimed that the gun that the police recovered had not fallen out of his pockets and did not belong to him. Rather, he contended it was already lying on the ground nearby.

B.

Following the pretrial hearing, the trial court denied defendant's motion to suppress the gun and CDS obtained by the police as a result of this warrantless encounter. The court issued a nine-page written opinion detailing its factual findings and legal conclusions concerning the motion.

The court found Sergeant Pettway's account of the events to be more credible than defendant's version. Specifically, the court described Pettway's testimony as "clear, candid and convincing." By contrast, the court found defendant's testimony "confusing, self-serving, and contradictory at times." Moreover, the court noted that defendant's testimony largely corroborated Pettway's, particularly as to the seizure itself.

In its legal analysis, the court rejected the State's initial argument that Pettway was working in a "community caretaking" capacity when he approached defendant and could not rely on that exception to the Fourth Amendment warrant requirements. However, the court found other grounds to justify the warrantless stop and search.

In particular, the court found Pettway had received information from a reliable source, and subsequently corroborated that information when he found defendant in the complex and matching the source's description. The court particularly noted defendant's observed demeanor, his initial presence in a high-crime area, and his flight from the scene. The court concluded the officer had reasonable suspicion to stop defendant based on his corroboration of the confidential source's testimony, and that additional facts also justified the stop.

C.

Pettway was a principal witness for the State at the ensuing trial, along with a ballistics expert and a laboratory analyst who tested the seized drugs. Defendant elected not to testify before the jury, and he presented no witnesses.

The jury found defendant guilty of the unlawful gun possession and CDS possession counts. In a second phase of the trial, which immediately followed with no additional testimony, the jury found defendant guilty of the "certain persons" count. Defendant stipulated to his previous commission of a predicate offense subjecting him to the certain-persons statute.

As we have already noted, the court sentenced defendant to an aggregate eight-year term. This appeal followed.

II.

Defendant raises the following points in his brief on appeal:

Point I

THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS EVIDENCE BECAUSE DEFENDANT WAS UNLAWFULLY SEIZED WHEN THE OFFICER ORDERED HIM TO "COME HERE" AND PURSUED HIM BASED ON A CONCLUSORY AND LARGELY UNCORROBORATED TIP FROM A CONFIDENTIAL SOURCE.

A. Defendant was seized when the officer approached him, identified himself as a police officer, and ordered him to "come here."

B. The detention was unlawful and suppression of the evidence is required because the confidential source was not demonstrably reliable and the other factors cited by the trial court could not establish reasonable suspicion before the detention occurred.

Point II

REVERSAL IS REQUIRED BECAUSE THE TRIAL WAS TAINTED BY IMPROPER BAD-ACT EVIDENCE WHEN THE OFFICER IMPLIED THAT DEFENDANT WAS A GANG MEMBER, INFORMED THE JURY THAT THE GUN WAS LOADED, AND TESTIFIED THAT DEFENDANT WAS IN A "HIGH-CRIME" AREA, AND BECAUSE NO LIMITING INSTRUCTIONS WERE PROVIDED ABOUT THAT EVIDENCE (not raised below).

A. The trial court erred in permitting testimony implying defendant was a gang member, that the gun was loaded, and that defendant was in a "high-crime" area.

B. Reversal is required because the evidence suggested defendant is a dangerous criminal and the

9

court gave no limiting charges to prevent a conviction on that basis.

POINT III

THE MATTER SHOULD BE REMANDED FOR RESENTENCING BECAUSE THE COURT DOUBLE-COUNTED THE PREDICATE CONVICTION FOR DEFENDANT'S CERTAIN PERSONS OFFENSE, IMPROPERLY CONSIDERED DEFENDANT'S PENDING OFFENSES, AND WRONGLY REJECTED MITIGATING FACTORS ONE AND TWO WITHOUT CONSIDERING THE GUN'S INOPERABILITY.

Defendant's reply brief largely restates these points, but he also raises the following argument responding to the State's argument of attenuation:

I.B. THE SEIZURE OF THE EVIDENCE WAS NOT ATTENUATED DUE TO DEFENDANT'S FLIGHT.

Having considered these arguments in light of the record and the applicable law, we affirm defendant's conviction and sentence.

A.

The only issue calling for our detailed examination is defendant's primary argument that the trial court erred in denying his suppression motion. He contends that none of the exceptions to the constitutional warrant requirements invoked by the State—either at the trial level or in this appeal— justify this warrantless stop and the seizure of the gun and CDS that fell out of defendant's pocket in the course of the police chase.

10

The State counters that the police action was constitutional. In particular, the State argues Sergeant Pettway had reasonable suspicion to stop defendant based upon the information from the civilian source, and also based on the circumstances of the encounter, including defendant's conduct when the officer approached him.

Alternatively, the State argues the record developed at the suppression hearing objectively shows that defendant was obstructing the police investigation by running away for two to three minutes after being commanded to stop, and reaching into his pockets.[2] We choose to rely on this alternative ground, which the State acknowledges was not raised below, in upholding the suppression ruling. In doing so, we reject defendant's procedural argument that we should decline to reach the obstruction issue, as we are satisfied the existing record is amply developed on the subject. See State v. Scott, 229 N.J. 469, 480 (2017) (noting appellate courts may entertain arguments not raised below if the record is sufficiently developed to enable such review).

In reviewing this search-and-seizure issue, we must afford substantial deference to the motion judge's determination that the sergeant's testimony about the encounter was more credible than defendant's version. State v. Hubbard, 222 N.J. 249, 262 (2015); State v. Locurto, 157 N.J. 463, 470 (1999).

---

[2] The State does not rely on appeal upon the community caretaking exception.

Among other things, we rely upon the factual findings of the judge with regard to the officer's observations and defendant's behavior at the scene. That including the nature and duration of defendant's flight and defendant's action of putting his hands into his pockets while he ran.

To perform our analysis, we need not resolve the parties' dispute as to whether the sergeant had sufficient reasonable suspicion to twice order defendant to "come here." Nor do we resolve whether there is a sufficient basis for Pettway to rely upon the source's assertion that defendant was present in the apartment complex carrying a handgun. In bypassing these discrete issues, we do note that defendant does not argue the sergeant engaged in discriminatory racial profiling in approaching him at the apartment complex and demanding him to "Come here." We also do not reach the issue of whether a reasonable person would have felt free to leave once the sergeant made those imperative commands, notwithstanding defendant's testimony at the suppression hearing that he subjectively felt he could leave.

1.

The crux of our analysis involves principles of obstruction and attenuation that have been well established in New Jersey case law. As a general matter, if a civilian's flight from a police officer independently supplies probable cause that he or she is obstructing the police, the claimed

unconstitutionality of the officer's underlying stop of that person can be inconsequential, so long as the flight is sufficiently attenuated from the stop. In such instances of obstruction, evidence derived from the post-flight seizure of contraband does not have to be suppressed.

The case law from the Supreme Court on these attenuation issues is instructive. In State v. Crawley, 187 N.J. 440, 451-52 (2006), our Supreme Court held that "when a police officer is acting in good faith and under color of his authority, a person must obey the officer's order to stop and may not take flight without violating N.J.S.A. 2C:29–1."[3] That statute embodies the

---

[3] The obstruction statute reads:

> Obstructing Administration of Law or Other Governmental Function. a. A person commits an offense if he purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act. This section does not apply to failure to perform a legal duty other than an official duty, or any other means of avoiding compliance with law without affirmative interference with governmental functions.
>
> b. An offense under this section is a crime of the fourth degree if the actor obstructs the detection or investigation of a crime or the prosecution of a person

13

strong public policy that "a person involved in a police encounter should [not] have an incentive to flee or resist, thus endangering himself, the police, and the innocent public." Id. at 451.

The Supreme Court in Crawley upheld the defendant's conviction for obstruction and declined to consider the constitutionality of the underlying stop. The Court reasoned that, whether the initial stop was in "good faith" and under the color of law (and therefore a predicate to an obstruction charge) was not critical to the ultimate issue of constitutionality. Id. at 444. Even if a stop is unconstitutional, "[a] person has no constitutional right to use an improper stop as justification to commit the new and distinct offense of resisting arrest, eluding, escape, or obstruction, thus precipitating a dangerous chase that could have deadly consequences." Id. at 459.

The following year, the Court further explained the relationship between obstruction and suppression of evidence in State v. Williams, 192 N.J. 1 (2007). In Williams, two police officers approached the defendant late at night in an area known to be "rampant with weapons and drug-dealing offenses" based on a station dispatch that a black man wearing a black jacket was

_____

for a crime, otherwise it is a disorderly persons offense.

[N.J.S.A. 2C:29-1. (emphasis added)].

dealing drugs at that location.  Id. at 4-5.  The officers stopped the defendant and asked him to put his hands on his head so they could search him.  Id. at 5.  When the officers approached, the defendant pushed one of them and fled.  Ibid.  Following a short chase, the officers detained the defendant and found a handgun in his waistband.  Ibid.  The defendant sought to suppress the handgun.

The Court in Williams presumed that the underlying stop was unconstitutional, but nonetheless declined to suppress the evidence.  Id. at 10.  The Court reiterated that a person must submit to a lawful investigatory stop, "regardless of its constitutionality."  Id. at 10.  The Court further clarified that whether an officer acts in good faith is a lenient standard.  So long as an officer making an investigative stop reasonably relies on information provided to him or her, and does not "without any basis detain[] a person on the street," the officer is presumed to be acting in good faith.  Id. at 13. (quoting Crawley, 187 N.J. at 461 n.8).

The Court in Williams expressly considered whether the defendant's obstructive behavior was sufficiently attenuated from the allegedly unconstitutional stop. In doing so, the Court applied the traditional standard for attenuation for a constitutional violation, examining: "'(1) the temporal proximity between the illegal conduct and the challenged evidence; (2) the

presence of intervening circumstances; and (3) the flagrancy and purpose of the police misconduct.'" Id. at 15 (quoting State v. Johnson, 118 N.J. 639, 653 (1990)).

The "determinative" factor in Williams was the presence of intervening circumstances: i.e., the defendant's "resistance to the pat down and flight from the police in this case." Id. at 18. The Court found that such resistance was "an intervening act—the crime of obstruction—that completely purged the taint from the unconstitutional investigatory stop." Id. at 18. Examining prior cases where defendants had similarly evaded law enforcement officials, the Court concluded in Williams that "the law should deter and give no incentive to suspects who would endanger the police and themselves by not submitting to official authority." Id. at 17. Since the defendant's obstruction in Williams was sufficiently attenuated from the underlying constitutional violation, the Court held suppression of the evidence was not required.

2.

A straightforward application of these Supreme Court precedents to this case demonstrates the seized gun and CDS should not be suppressed. The State maintains that Pettway acted in good faith when he approached defendant based on a tip from a confidential source. Pettway testified that he was

16

making an investigative stop when he approached defendant and told him to "come here."

Defendant was obligated to obey the officer's command, even if it was arguably unconstitutional. Williams, 192 N.J. at 10. We agree with the State that, when defendant fled, "there was probable cause to believe [he] violated the obstruction statute. . . [and] [t]hat flight was an intervening act that purged the taint from any unconstitutional stop." Evidence obtained following his flight accordingly should not have been suppressed.

Defendant argues his flight was not attenuated. He contends that the first attenuating factor of "close temporal proximity" particularly weighs against suppression. We are unpersuaded the estimated two or three minute flight had such close proximity in time. In any event, as the Supreme Court expressed in Williams, the "determinative" focus is on the second attenuation factor, i.e., whether the obstruction was an intervening circumstance. Williams, 192 N.J. at 16.

With regard to this second factor, defendant relies upon this court's opinion in State v. Williams, 410 N.J. Super. 549 (App. Div. 2009), certif.

17

denied, 201 N.J. 440 (2010) ("Williams II")[4], to argue the seizure and his flight were not sufficiently attenuated because, in contrast to the defendant in the Supreme Court's Williams decision, he did not physically resist a lawful seizure.

Physical resistance is not required to establish attenuation. Although physical resistance would clearly be an example of obstruction of justice, the statute clearly refers to "force" or "flight" as independent means of obstructing a lawful investigation. N.J.S.A. 2C:29-1. As the Court in Crawley observed, "any flight from police detention is fraught with the potential for violence because flight will incite a pursuit, which in turn will endanger the suspect, the police, and innocent bystanders." Crawley, 187 N.J. at 460 n.7.

Defendant also argues that, unlike in Crawley or the earlier Williams decision, in this case he was not actually charged with obstruction. He argues the State consequently should not be able to assert attenuation. We disagree.

The State's decision not to charge obstruction is not controlling. That decision is discretionary. Prosecutors frequently do not charge less serious offenses when other, more serious charges arising out of the same incident are lodged against a defendant.

---

[4] Despite the common surname, the Williams II case in this court involved a different defendant and prosecution than the Supreme Court's earlier opinion in Williams.

The plain language of the obstruction statute prohibits "prevent[ing] . . . a public servant from lawfully performing <u>an official function</u> by means of <u>flight</u> . . . " N.J.S.A. 2C:29-1 (emphasis added). Both <u>Williams</u> and <u>Crawley</u> hold that an investigative stop is such an "official function."

Here, defendant fled the scene when Pettway attempted to make an investigative stop. Regardless of whether the State believed there was evidence beyond a reasonable doubt to charge him for the crime, at the very least there was probable cause to pursue him when he fled and disobeyed the officer's command to stop.

Furthermore, defendant's uncontroverted movement of his hands into his pockets strengthens the State's position. Such a movement reasonably indicates defendant could be armed and reaching for a weapon, thereby threatening the officer's safety.

Lastly, as to the third factor, defendant has not shown that the "flagrancy and purpose" of the alleged police misconduct weighs against attenuation. To the contrary, Pettway and his fellow officers acted sensibly in chasing defendant—who appeared as if he could have been armed—when he ignored Pettway's directives and fled. Even if, for the sake of argument, Pettway initially lacked what a court might conclude was reasonable suspicion to

conduct an investigatory stop, the officer's initial actions in stopping defendant were not "flagrantly" unconstitutional.

In sum, the pertinent factors, on balance, support the State's argument of attenuation. Suppression of the seized evidence was not required.

We therefore affirm the denial of the suppression motion, albeit for different legal reasons than those stated by the trial court in its decision. El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 169 (App. Div. 2005) (recognizing our function as an appellate court is to review orders and decisions, not opinions, and that we can affirm those decisions without adopting the trial court's legal reasoning). See also Scott, 229 N.J. at 479.

B.

The remaining issues raised by defendant concerning—the alleged improper admission of prejudicial character evidence against him at trial, and alleged sentencing errors—lack sufficient merit to warrant much discussion. R. 2:11-3(e)(2). We only add the following brief comments.

Defendant maintains the trial court should not have admitted evidence: (1) impliedly suggesting he was a gang member; (2) revealing that the recovered gun was loaded; and (3) stating that the events took place in a "high-crime" area. He further contends the trial court, sua sponte, should have issued a limiting instruction about these items. We discern no plain error stemming

from these matters that were not raised below.  State v. Macon, 57 N.J. 326, 336 (1971).  Moreover, the trial court did not abuse its discretion as to these evidential items.  State v. J.A.C., 210 N.J. 281, 295 (2012).

None of the three items transgress the prior "bad acts" limitations of the character rules and N.J.R.E. 404(b).  The State's witnesses did not state that defendant was a member of a gang.  Unlike his testimony at the suppression hearing, Pettway's trial testimony that he was in the area as a member of the Street Crimes Unit and responding to a recent "incident" at the complex did not necessarily suggest to the jury it was a "high-crime area."  Moreover, the sergeant made clear to the jury that defendant was not a suspect in the earlier incident.

As to the State's proof that the seized gun was loaded, we conclude such evidence was "intrinsic" to the charged firearm possession crimes, regardless of the gun's actual operability.  State v. Gantt, 101 N.J. 573, 584 (1986) (holding that an inoperable gun constitutes a "firearm" if it was originally designed to fire bullets); see also State v. Rose, 206 N.J. 141, 161-62 (2011) (holding that relevant evidence "intrinsic" to an offense does not have to satisfy Rule 404(b)'s admissibility standards).  In short, no reversible evidential error occurred, and there was no need for any special limiting instructions to the jury.

We likewise reject as unmeritorious defendant's challenges to his eight-year prison sentence. The trial court appropriately found aggravating sentencing factors three, six, and nine applicable. See N.J.S.A. 2C:44-1(a)(3), (6), and (9). Among other things, the court recognized defendant's two previous indictable convictions and the substantial need for deterrence. No mitigating factors demonstrably apply. There was no impermissible double counting. The trial court's reference to pending charges against defendant, although improvident, does not undermine the overall fairness or integrity of the sentence.

The sentence does not shock the judicial conscience or represent an abuse of the trial court's wide discretion over sentencing. See State v. Case, 220 N.J. 49, 54 (2014); State v. Bieniek, 200 N.J. 601, 607-08 (2010). We therefore uphold it, as well as defendant's conviction.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A- 4241-17T1